[L. A. No. 4184. In Bank.—September 26, 1933.]

D. A. JACOBS, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Frank J. Golden for Petitioner.

Philbrick McCoy for Respondent.

THE COURT.—Petition to review the recommendation of the respondent, The State Bar of California, that the petitioner be suspended from the practice of law for a period of three years.

The petitioner was cited to appear before the local administrative committee in Los Angeles upon charges of conversion and misappropriation of funds; for knowingly making a false return on a garnishment, and upon two other charges, including one of unethical conduct in revealing to a third party information prejudicial to his client. The accusations were made by two complainants, Julius Fried and Miss Wilmetta Crawford. The petitioner is about fifty years of age and has practiced law in Los Angeles since his admission in 1907 without any charge heretofore having been brought against him.

In 1931 Julius Fried and W. James Hamlin were the two-thirds and one-third owners, respectively, of the stock in a chain corporation known as Orange Julius, Ltd., and its corporate subsidiaries. Fried was the president and collected the money taken in by the stores in Los Angeles. The petitioner herein had been the attorney for the company. In June, 1931, Hamlin suspected Fried of peculations and he requested the petitioner to call Fried into his office. Upon his arrival Fried faced Hamlin's accusation of misappropriating cash register receipts to the extent of upwards of $100,000. Fried assigned to Hamlin all of his stock in the corporations and resigned as president, although he was still retained by Hamlin as an employee to help the company, if possible, out of its then difficult financial condition.

In the latter part of 1931 Fried approached the petitioner, Jacobs, to open negotiations with Hamlin for the repurchase by Fried of the stock turned over to Hamlin, or a controlling portion thereof, but without disclosing the real purchaser. At this time Hamlin and the company were represented by another attorney, Victor Ford Collins, and the petitioner continued to act for the company only for the

purpose of completing some tax work. The petitioner represented Fried in the negotiations which followed.

Negotiations between Jacobs and Hamlin for the purchase of the stock went forward. Fried put up $500 in cash as earnest-money, for which Jacobs receipted. Hamlin, however, held out for $15,000 as a cash payment upon $25,000 as the full purchase price of the stock. On January 21, 1932, Fried put into Jacobs' hands $14,500, consisting of a $10,000 bill, four $1,000 bills and five $100 bills. Fried accompanied Jacobs part way to the bank, but when Jacobs arrived at the bank alone he changed his mind about depositing the money and placed it in his safe. Within an hour an attachment, issued in an action brought by the company against Fried, was served on Jacobs. The next day, "over-persuaded," as he admits by Fried's conduct and demands, the petitioner changed the $10,000 bill and returned to Fried $7,500 of the money.

It was also about this time that Jacobs prepared for Fried a purported receipt and security, dated January 21, 1932, executed by Fried, for delivery to the complainant Miss Crawford. Fried and Miss Crawford claimed that the money put up by Fried belonged to Miss Crawford. Jacobs also learned for the first time that Miss Crawford, at whose home Fried resided, was the same person reputed to be Mrs. Fried. These and other facts in the record not necessary to note specifically support the petitioner's belief and the respondent's conclusion that the money deposited with Jacobs in fact belonged to Fried.

Both Miss Crawford and Fried accuse the petitioner of not having turned back to Fried the sum of $7,500 on January 22, 1932. The petitioner on the hearing exhibited from his own possession a form receipt signed by him dated "1–21–1932" receipting for the sum of $14,500 from Julius Fried. Across the face of this, in the petitioner's handwriting, appears: "$7500 of this money refunded and receipt taken up and cancelled. 1–22–32. D. A. J." In the petitioner's receipt book, wherein he kept carbon copies, the copy form in the place from which this original receipt would have been taken, is blank by virtue of erasure. The petitioner had at first evaded the demand of the district attorney's office for the receipt book and then admitted on

the hearing that he had become "panicky" and erased the copy in an attempt to "cover up".

The petitioner made no return to the first attachment served on him. A second attachment or garnishment was served on him. Finally, on February 25, 1932, Hamlin's attorney, Mr. Collins, wrote a letter to the petitioner demanding that a return be made. The petitioner noted an answer on Mr. Collins' letter and returned it to him, to the effect that he held $7,500 subject to attachment in the case and would make a return any time he was required to do so. About the middle of March the petitioner made a written return to the sheriff that he held $7,000 subject to his claims for compensation. The petitioner contends that the sum of $7,000 was inserted in error, and that it should have read $7,500. Subsequently he deposited with the sheriff seven cashier's checks for $1,000 each and admittedly retained $500, which he claimed to be due him for services rendered. He contends that his services were rendered, not as attorney, but as escrow-holder. Inasmuch as he held $15,000 in that capacity for the period of only one hour; that he held that sum for about twenty-four hours subject to the attachment and, in spite of the fact that $15,000 should promptly have been returned to the sheriff, he returned $7,500 to Fried and retained the balance as a garnishee only, together with the fact that no claim for compensation was made or discussed and was obviously an afterthought, the excuse for refusing to return the additional $500, as found by the respondent, is palpably weak if not entirely groundless.

The petitioner. defends his action in returning to Fried $7,500 of the attached money by stating the expectation nursed by him at the same time that his action would be approved by Hamlin, although in the same breath he is compelled to admit that Hamlin had not yet been informed of the deposit by Fried of the sum of $15,000 just prior to the levy. In defense of the reasonableness of this expectation, the petitioner discloses the fact that the action in which the attachment was levied was settled by the equal division between Hamlin, or the company, and Fried, of the $7,000 deposited with the sheriff.

The local committee found that the petitioner filed a return to the attachment in the pending action known by

him to be false as to the amount returned. As to the misappropriation and conversion charge, the committee found that the evidence did not support a conclusion adversely to the petitioner in any respect except as to the sum of $500 purported to have been retained by the petitioner as his compensation in the escrow transaction. In the face of testimony by Hamlin that he had had Fried trailed by detectives and had independently observed or drew his own deduction that Fried was the undisclosed purported purchaser of the controlling interest in the company, the committee found that the charges of revealing information were not supported. The only other charge found by the committee to be supported was a fifth charge added by amendment wherein the petitioner was accused of unlawfully returning to Fried moneys garnisheed in the hands of the petitioner. Although the committee also found that the moneys were returned by Jacobs with the reasonable expectation that his action would be approved by Hamlin, it nevertheless recommended disbarment. The findings of the committee were adopted by the board.

The petitioner on this review admits the wrongdoing in so far as the charges are found to be supported by the evidence; but he relies upon the finding respecting the reasonableness of his expectations as to the final outcome of the controversy between Hamlin and Fried, together with his contention that he was entitled to withhold a reasonable fee in the matter, as supporting his claim for complete exoneration. Unquestionably the board took into consideration these claims of the petitioner, together with his age and former record, in modifying the recommendation to suspension for three years, instead of adopting the committee's recommendation of disbarment.

The petitioner on the record herein has failed to meet the burden devolving upon him to show that the board's decision is erroneous or unlawful. (*Aydelotte* v. *The State Bar*, 209 Cal. 737 [290 Pac. 41]; Stats. 1927, chap. 34, sec. 26.) In support of his attempted showing he contends that he was not acting as an attorney in the transaction, but claims that he acted merely as an escrow-holder and that the only liability to which he became subjected by his returning $7,500 to Fried is the civil liability imposed by section 544 of the Code of Civil Procedure. The crea-

tion of a civil liability, statutory or otherwise, would not release him from his obligation to answer the charges of wrongdoing in the handling of funds in his care, if otherwise he is amenable to the disciplinary process of the State Bar Act. It may be assumed that he was acting merely as an escrow-holder in the transaction. It is the additional fact of his status as an attorney licensed to practice and member of The State Bar that brings him within its disciplinary reach whenever "the commission of any act involving moral turpitude, dishonesty or corruption" is involved. (Code Civ. Proc., sec. 287, subd. 5.) In this connection we are constrained also to note the inconsistency between the petitioner's position that he acted as an escrow-holder merely and his reliance upon cases involving claims and liens as an attorney for services rendered as such pursuant to which he urges the right to retain moneys to satisfy his client's debt to him for services rendered.

The petitioner's attempt to have this court confine within narrower limits the definition of what constitutes moral turpitude cannot succeed. This court has theretofore declared the standard in that respect, viz., that moral turpitude comprises everything done contrary to justice, honesty or good morals. (*Lantz* v. *The State Bar*, 212 Cal. 213, 218 [298 Pac. 497], citing *In re Coffey*, 123 Cal. 522 [56 Pac. 448].)

It is ordered that the petitioner be and he is hereby suspended from the practice of the law in this state for the period of three years from and after the filing of this order.