[L. A. No. 18490. In Bank. Apr. 23, 1943.]

A. P. MICHAEL NARLIAN, Petitioner, v. THE STATE
BAR OF CALIFORNIA, Respondent,

Joseph Musgrove for Petitioner.

Jerold E. Weil and Stanley M. Arndt for Respondent.

THE COURT.—This is a proceeding to review a recommendation of the Board of Governors of The State Bar that petitioner be disbarred from the practice of law.

By a notice to show cause issued in August, 1941, petitioner was charged with the commission of acts involving moral turpitude and with the violation of his oath and duty as an attorney. From findings of fact made at the termination of three hearings in this disciplinary matter, Local Administrative Committee No. 14 for the County of Los Angeles concluded that petitioner was guilty as charged, and that, in addition, he had commingled the money of a client with his own funds, in violation of rule 9 of the Rules of Professional Conduct of The State Bar. The committee recommended disbarment. Thereafter petitioner's counsel and the examiner for The State Bar presented further argument to the Board of Governors, and it, "after full consideration and discussion of the record in the . . . proceeding," approved and adopted the committee's findings, with but one slight alteration in recognition of an accounting credit due petitioner as the result of his payment of a delinquent sum sometime between the second and third hearings before the local administrative committee. Upon the findings as so modified the Board of Governors, by a vote of eight to five, made its recommendation to this court that petitioner be disbarred. In the resolution of the board this court was advised that in fixing the degree of discipline recommended the board took into consideration petitioner's past record. In his application for review petitioner challenges the sufficiency of the evidence to sustain the determination of the board, and in particular in this connection he questions the propriety of its recommendation based in part upon reference to previous charges of professional misconduct.

In the findings, as modified, the facts involved in the pres-

ent proceeding are recited substantially as follows: Sometime prior to May 6, 1939, petitioner was employed by one A. W. Elder to represent the latter in a divorce action between him and his wife, Olga E. Elder. By a property settlement agreement prepared by petitioner and executed by the parties on the date just mentioned, it was provided that A. W. Elder should pay to Olga E. Elder the sum of $270 as alimony, in regular monthly installments of $15, commencing on April 1, 1939, and continuing until the full amount was paid. The agreement further provided that A. W. Elder should pay to Olga E. Elder $125 for attorneys' fees and $15 for court costs in the divorce action, such total sum of $140 to be payable as follows: $37.50 at the time of the execution of the agreement, $22.50 on May 1, 1939, and the balance of $80 in regular monthly installments of $10, commencing on June 1, 1939. Between the period of April 1, 1939, and August 5, 1940, Mr. Elder forwarded to petitioner various sums aggregating $449.50, with the understanding that petitioner would pay from such amount $270 to Mrs. Elder as her alimony pro rata and $140 as scheduled for her attorneys' fees and court costs. Although Mr. Elder's periodic payments to petitioner over these months were made substantially on the dates required by the property settlement agreement and were amply sufficient to satisfy the running contractual obligation with Mrs. Elder, during this time from the funds so collected petitioner remitted to her but $15, an installment forwarded in June, 1940, and to her attorneys only the aggregate amount of $107.50.

During the month of November, 1940, Mrs. Elder called on Mr. Elder at his office to ascertain why he had failed to make the scheduled payments. He informed her that he had paid to petitioner the sums required by the terms of the property settlement agreement, and in corroboration of such statement he showed her his canceled checks in the matter. In her presence he then telephoned to petitioner for an explanation of the situation, and in the course of conversation the latter assured him that he had the money and would make immediate payment to Mrs. Elder. After several unsuccessful attempts to secure an appointment with petitioner, Mrs. Elder had her sister-in-law arrange for the desired interview by using her own name and without disclosing their relationship. At the appointed time, which was on a day toward the end of November, 1940, Mrs. Elder and her sister-

in-law saw petitioner at his office, and he stated to them that he was not sure what money was owing to Mrs. Elder under the agreement, that the bookkeeper in charge of his records was absent that afternoon, but that he would have the necessary information the following day. When Mrs. Elder called at the time suggested by petitioner, she was again met with the excuse that his bookkeeper's failure to return to work necessitated their waiting another day to settle the matter. Finally, on December 2, 1940, in response to Mrs. Elder's telephonic inquiry of him as to when he would pay the money due, petitioner said that checks in the proper amount would be forwarded to her by mail that afternoon. When she did not receive the checks in due course, Mrs. Elder, on December 4, 1940, lodged a complaint at the office of The State Bar. The next day, December 5, 1940, she notified Mr. Elder of her action in the matter, and by letter of the same date he advised petitioner of Mrs. Elder's report of her grievance to the bar association.

On December 6, 1940, petitioner mailed to Mrs. Elder's counsel at Napa, California, two checks: one payable to Mrs. Elder in the sum of $135 and one payable to her counsel in the sum of $120. In the accompanying letter of transmittal petitioner requested that the check for $120 not be deposited for a few days because petitioner was uncertain if his accounting in the matter was correct. On the date of drawing these checks petitioner did not have in the bank sufficient funds to cover either one. On December 16, 1940, the check for $135 was presented for payment, and on the same day petitioner deposited in his bank account that amount to cover said item. After payment of that sum from petitioner's account his balance in the bank stood at $1.15. The check for $120, endorsed to Mrs. Elder and deposited by her in the bank, was returned to her with the notation that payment had been stopped. Mrs. Elder thereupon attempted to communicate with petitioner and a few days later when she did see him at his office, he told her that payment on the $120 check was stopped because he wanted a signed satisfaction before the check was cashed. Petitioner did not give her the money at that time but told her to return a day or two later. On January 7, 1941, Mrs. Elder again went to petitioner's office, and at his request signed the following three documents: (1) a satisfaction of judgment as of the date

just mentioned; (2) a letter dictated by petitioner and directed to her attorney, asking him to sign and file the satisfaction of judgment; and (3) a letter addressed to petitioner, all of which excepting the word "Jan." and the signatures of Mrs. Elder and a witness, was in petitioner's handwriting. This last letter contains above Mrs. Elder's signature the following sentence: "This matter concluded to my satisfaction." Mrs. Elder was unable to remember whether these words were on the letter when she signed it, but an examination of the document indicated to the members of the committee that they were not. Mrs. Elder unquestionably received $70 that day, but it does not clearly appear when she received the $50 balance of the full sum of $120. She testified that it too was paid that day, but petitioner claimed that it was paid to her on some previous date, although he was unable to state how or when.

At no time between August 5, 1940, and January 7, 1941, did petitioner have on deposit in the bank funds sufficient to have paid Mrs. Elder or her attorneys the amounts due and which petitioner had received from Mr. Elder. Petitioner was unable to say what disposition he had made of any single payment forwarded to him by Mr. Elder, but he stated that he thought that his client's respective personal checks were cashed, the money accumulated and converted into cashier's checks. Included in such cashier's checks would be funds of petitioner and other clients. Petitioner testified that he stopped payment on the $120 check above mentioned because he had not received a satisfaction of judgment from Mrs. Elder's counsel, but in the letter of transmittal of December 6, 1940, accompanying the two checks under discussion he requested that the $120 one not be cashed for a few days until he had heard from Mr. Elder, and that "as soon as these amounts are paid you will be kind enough to file, or forward to me for filing, a satisfaction of judgment." At the time of the first two hearings before the committee there was still a balance of $22 due to Mrs. Elder's attorneys under the property settlement agreement, but such amount was paid prior to the last hearing in November, 1941. Petitioner was served with a subpoena duces tecum to produce before the committee his ledger and records referring to this matter, but he did not do so, stating that they apparently were in files which had been misplaced.

Inasmuch as this court is not bound by the findings

or recommendation made by the local administrative committee, nor their adoption by the Board of Governors (*In re Shattuck,* 208 Cal. 6 [279 P. 998]; *In re Petersen,* 208 Cal. 42 [280 P. 124]; *In re Stafford,* 208 Cal. 738 [284 P. 670], the entire record herein has been carefully examined anew to ascertain the weight of the evidence and whether or not any charge has been proven against petitioner which merits his disbarment. From such complete review the conclusion is inescapable that the findings, as modified, fairly reflect in their recital of the present factual situation the censurable nature of petitioner's conduct, and that the record as a whole fully justifies the recommendation which has been made in this matter. Petitioner's assertion that his inability to produce his pertinent files, allegedly mislaid in his office some three or four months prior to the disciplinary hearings, placed him at a disadvantage is manifestly a claim incapable of substantiation and consequently a negligible factor.

Countless discrepancies and weaknesses appear throughout petitioner's testimony and argument in his attempt to explain his failure to make prompt accounting of funds transmitted to him by Mr. Elder, his client, in satisfaction of the latter's contractual obligations. Petitioner claims that when Mrs. Elder called upon him at his office in November, 1940, and requested the sum of $255 as owing to her under the terms of the property settlement agreement, he did not give her that or any other amount because he was not certain whether the agreement covered payments for twelve or eighteen months. However, the governing contract was in writing, petitioner had a copy in his possession, and admittedly his files in the matter were at that time accessible in his office for inspection. Likewise without force as a basis for his refusal to comply on that occasion with Mrs. Elder's demand for her delinquent alimony installments is petitioner's present assertion of a then existent uncertainty on his part as to the amount of his own fee and the status of his receipts therefor in this matter. In the first place, petitioner's purported dubiousness on this phase of the Elder account would appear feigned in view of petitioner's letters to his client outlining in definite terms the fee charges, the corroborative correspondence contained in petitioner's then available office records, Mr. Elder's positive statement at the disciplinary hearing that he had paid the balance of petitioner's agreed

fee in April, 1939, and petitioner's prompt admission that his client's testimony as to the condition of their financial arrangements was unquestionably correct. Moreover, as a second consideration, the circumstance of a default in petitioner's fee receipts for his services would not permit his assertion of a personal claim to funds remitted to him by his client for discharge of the latter's obligations.

Petitioner now suggests that a desire to "make a better deal for his client" prompted him to accumulate the alimony payments as a basis for future negotiations. Mr. Elder testified that he assumed that petitioner was forwarding the money promptly to Mrs. Elder pursuant to the terms of the agreement, and petitioner himself admitted at the hearing that his dilatory method of accounting to Mrs. Elder was not a proper course of procedure. Moreover, in the Elder divorce action the property settlement agreement had been incorporated in the interlocutory and final decrees entered on May 31, 1939, and June 17, 1940, respectively, and petitioner's failure to remit to Mrs. Elder the alimony payments on the scheduled dates was exposing his client to prosecution in contempt proceedings. In this connection petitioner's present claim that his doubt as to whether the agreement was made a judgment warranted his delay in remitting the alimony payments will not bear close scrutiny. The certificate of the county clerk, here in evidence, discloses that petitioner admitted service of a copy of the interlocutory decree on June 2, 1939, and that he himself prepared and forwarded the final decree for filing in June, 1940. Furthermore, the original satisfaction of judgment signed by Mrs. Elder in petitioner's office on January 7, 1941, as above stated, referred specifically to the entry of the final decree by date, its location by page in the proper judgment book, and its provision relative to money payments. In this state of the record petitioner's dereliction in his duty to make prompt accounting of funds entrusted to his care for disbursement in specified channels is beyond question.

It would serve no useful purpose to detail the petitioner's complaint that the adopted findings are unfair and partial because they do not include certain evidentiary matters in his favor. His points of reference constitute at most mere instances of conflict in the testimony, and they are wholly at variance with the substantial weight of the evidence. In connection with these alleged unjust omissions he particu-

larly challenges the adequacy of the findings because of their failure to show that his termination of the Elder accounting matter met with the *final* approbation of the principal parties in interest. In the first place, it is highly questionable whether the record sustains petitioner's claim of satisfaction, and secondly, the *ultimate* approval of said parties would not validate previous censurable conduct in the handling of a client's funds. When queried on the subject of whether this matter was concluded to her satisfaction, Mrs. Elder testified at the disciplinary hearing as follows: "Yes it was, except I was still *unsatisfied* with Mr. Narlian's action in the case, but so far as receiving the money, I did receive the money." Also of importance in this regard is the condition of the aforementioned letter of January 7, 1941, directed to Mrs. Elder's counsel and signed by her in petitioner's office upon her receipt of the balance of the money due her under the property settlement agreement. While this document, as introduced in evidence herein, contained immediately above her signature the sentence "This matter concluded to my satisfaction," Mrs. Elder was not certain that such document included these words when she executed it. She testified on the subject as follows: "I do not remember definitely whether they [said words] were there or not; I can't remember that they were." Moreover, upon examination the writing is readily susceptible of the interpretation placed thereon by the local administrative committee after inspection, to the effect that the words in question were not written there when Mrs. Elder signed the document. As to Mr. Elder's purported accord with petitioner's method of allocating and disbursing the funds forwarded in pursuance of the schedule fixed by the mentioned agreement, the undisputed evidence shows that Mr. Elder completed the specified payments in August, 1940, that his desire to avoid unpleasant transactions with Mrs. Elder had constituted a prime motivating factor in his prompt discharge of his contractual obligations as the terms of settlement required, that he had assumed that petitioner had been making timely transmittal of the alimony payments to Mrs. Elder, and that his first intimation to the contrary came as the result of her complaint in his office in November, 1940. In the light of these considerations referable to Mr. Elder's understanding of this affair during the pertinent period covered by the agreement, his statement at the dis-

ciplinary hearing that he was "satisfied" with petitioner's services since "everything has been paid" and he was no longer in default, cannot reasonably be regarded as evidence of his *unqualified* approval of petitioner's accounting practice in this case. In fact, these references to the evidence at petitioner's instance demonstrate only an attempt on his part to evade the consequences of his financial irresponsibility in this matter and certainly do not establish the existence of any mitigating factors in his favor. Moreover, as above indicated, the *present* opinion of the principal parties in interest with regard to petitioner's conduct in the premises does not ameliorate the gravity of the charges subject of this disciplinary proceeding nor obviate considerations of petitioner's remiss performance of his professional duties. The point at issue is whether petitioner in his management of this affair has shown himself to be a person worthy of trust and duly appreciative of the ethics of the legal profession. (*Marsh* v. *State Bar*, 2 Cal.2d 75 [39 P.2d 403].)

There can be no question under the evidence but that petitioner is guilty of a violation of rule 9 of the Rules of Professional Conduct, providing that "A member of The State Bar shall not commingle the money or other property of a client with his own . . . " (213 Cal. cxv.) As was observed in *Peck* v. *State Bar*, 217 Cal. 47, 51 [17 P.2d 112], "This salutary rule was adopted to provide against the probability in some cases, the possibility in many cases, and the danger in all cases that such commingling will result in the loss of clients' money." From the record here it appears that it was petitioner's policy to convert into cashier's checks all funds coming into his hands in connection with his legal practice; that small collections would be accumulated until they were sufficient in the aggregate to permit their transfer into checks of some sizable denomination, usually in round figures; that inasmuch as petitioner did not keep a bank account with any appreciable balance, he made indiscriminate use of these cashier's checks in the discharge of various obligations, whether they involved appropriate disbursements of moneys to clients or the satisfaction of his own business expenses, such as office rent and secretarial salaries; that his practice was to issue personal checks on his bank account in excess of the funds there standing to his credit, and upon the bank's notification of his office in due course of the consequent deficiency, cashier's checks in a suitable amount

would be deposited to meet the charge against his account. When in connection with this financial practice petitioner was questioned at the hearing as to his disposition of the regular installment payments forwarded to him by Mrs. Elder in pursuance of the terms of the property settlement agreement, petitioner was vague and unconvincing in his attempt to correlate such sums with the purchase of any particular cashier's checks listed by him as acquired during the accounting period in question, nor did he know which ones of such checks had been cashed and which were outstanding. He finally concluded that the Elder moneys, though not separable in relation to the itemization of the cashier's checks, "might well be" comprehended therein. Petitioner admitted that he "did not have any trust account for trust funds." This evidence of petitioner's inability to distinguish with any degree of certainty trust moneys in his possession not only demonstrates his disregard of the prohibition of the pertinent rule above quoted, but also vitiates the effectiveness of his claim that during the entire time of delinquency in his accounting for the Elder payments as received by him, such sums were available for his disbursement as specified by the property settlement agreement. In addition, such assertion of financial responsibility as to his trust obligations for the period of default here involved is wholly inconsistent with petitioner's further line of argument that the *fear of attachment* prompted him, as a matter of protection for his clients, to convert their funds into miscellaneous cashier's checks for storage in his office rather than to deposit them in an appropriately designated bank account. If, while in his possession, moneys confided to his care were in fact exposed to the danger mentioned, petitioner's maintenance of a trust account for their proper segregation was more, rather than less, essential as a precautionary measure. Moreover, such situation serves to aggravate the gravity of petitioner's failure to transmit promptly to Mrs. Elder her installment payments so that they would not be endangered by unnecessary retention on his part.

At this point of discussion it is relevant to note in relation to the present charges brought against petitioner the reference in the adopted findings to his past conduct. The record in this matter discloses that between the years 1928 and 1941 six formal disciplinary proceedings were instituted

against petitioner. Four of these were dismissed by the Board of Governors in accordance with the recommendations of the respective local administrative committees; in another, the trial committee recommended a suspension of six months, but the board, upon proof of restitution of certain moneys to the aggrieved client as directed in its resolution passed at a previous hearing in the matter, dismissed the complaint; and in the one remaining and of the most recent date the committee recommended a six months' suspension from the practice of the law, which measure of discipline the board reduced to thirty days. (A review of the latter disciplinary proceeding by this court was not sought.) Five of these six previous instances of complaint directly involved difficulties concerning money transactions and accounting practices between petitioner and his various clients. Because of their chronological significance here, two of the prior proceedings merit some passing comment. One relates to a disciplinary hearing in 1939, wherein petitioner's system of converting into cashier's checks clients' funds in his possession was examined by the trial committee and declared to be "not the best practice." Accordingly, in its findings and recommendation to the Board of Governors in April, 1939, the committee referred to its statement to petitioner that "it would be wise in the future to open a clients' account or trustee account in which funds belonging to clients should be deposited" and his response that "he intended to do so." Yet despite this criticism and his agreement to follow the committee's suggestion, petitioner in the very same month—April, 1939—in which he made his promise to correct his objectionable business methods began to accumulate in cashier's checks the Elder installment collections as they arrived at his office for disbursement under the terms of the property settlement agreement. The other prior disciplinary instance of particular relevancy here was heard by the local administrative committee in October and November, 1940, and ultimately resulted in petitioner's suspension of thirty days from the practice of the law in 1941, as above stated. From his testimony in that proceeding it appears that petitioner's inability to satisfy before November, 1940, a judgment obtained against him by his client (the complaining witness) in the preceding January, because of certain accounting defalcations, was due to "restricted collections" in petitioner's office during that year, and that he paid as soon as he could do so. There, too, the evidence disclosed petitioner's failure to keep a trust

account and his resultant difficulties in his system of cashier's checks indiscriminately representative of his own and clients' funds. In that proceeding petitioner's admission of financial embarrassment throughout the major portion of the year 1940 as the reason for his failure to discharge promptly a judgment held against him by one of his clients is irreconcilable with his claim now that during the same period he had available ample funds to have satisfied Mrs. Elder's payments under the agreement.

It is appropriate to take into consideration this previous record in determining what penalty should be imposed for the misconduct involved in the present proceeding. (*Mills* v. *State Bar*, 6 Cal.2d 565 [58 P.2d 1273]; *Kennedy* v. *State Bar*, 13 Cal.2d 236 [88 P.2d 920]; *Petersen* v. *State Bar*, 16 Cal.2d 57 [104 P.2d 769]; *Hennessy* v. *State Bar*, 18 Cal.2d 685 [117 P.2d 326]; *Cheleden* v. *State Bar*, 20 Cal.2d 133 [124 P.2d 1].) This evidence of repeated disputes with clients with regard to money matters involving the filing of several complaints with The State Bar and the ensuing institution of formal disciplinary proceedings, one of which culminated in the aforementioned suspension, discloses an habitual failure on the part of petitioner to appreciate the responsibilities of his profession rather than an isolated instance of dereliction in his duty followed by a firm determination to make amends. From the record it appears that on two of the occasions prior to the 1940 one above noted, it was only after disciplinary proceedings had been commenced that petitioner paid to his respective clients funds which he had improperly withheld from them. He has followed a like policy in the present situation by his delay of many months, and until after complaint was made to The State Bar by the aggrieved party, before transmitting installment payments entrusted to his care by his client for prompt disbursement in discharge of the latter's contractual obligations. An attorney is not entitled to any indulgence by reason of restitution of moneys wrongfully retained from his client, especially where such restitution is made merely as a matter of expediency and under pressure. (*Herrscher* v. *State Bar*, 4 Cal.2d 399 [49 P.2d 832]; *Maggart* v. *State Bar*, 7 Cal. 2d 495 [61 P.2d 451].) The same principle is equally applicable here in circumstances involving like considerations with respect to an objectionable accounting practice. In concluding this discussion of petitioner's persistent digression

from the ethical standards of the legal profession, the following observation made in *Mills* v. *State Bar, supra,* at p. 567, is pertinent: ''Whatever might be said in favor of a milder punishment for single misdemeanors not involving deliberate moral turpitude, there is no doubt in our minds that any lawyer who is guilty of habitual misuse of the funds of his clients should be deprived of the license under which he is authorized to practice law, and by which he has been recommended to the public as a person worthy of trust.''

It is therefore ordered that petitioner be disbarred and that his name be stricken from the roll of attorneys of this state, the order to become effective July 7, 1943.

Reporter's Note: On May 20, 1943, the judgment was modified to read as above.