[L. A. No. 22166. In Bank. June 30, 1952.]

OLIVER O. CLARK, Petitioner, v. STATE BAR OF CALIFORNIA, Respondent.

John W. Preston for Petitioner.

Edward Hervey and Jerold E. Weil for Respondent.

THE COURT.—Petitioner Oliver O. Clark is charged in six counts with violation of his oath and duties as an attorney (Bus. & Prof. Code, §§ 6067, 6103), with violation of rule 9 of the Rules of Professional Conduct of the State Bar of California (commingling of funds), and with commission of acts involving moral turpitude and dishonesty. (Bus. & Prof. Code, § 6106.) After a hearing, the local administrative committee found, except as to Counts One and Five, that the acts alleged to have been committed or omitted were in fact committed or omitted. The committee found, however, that there was no intentional commission or omission, that petitioner was simply guilty of "oversight," "carelessness," and "neglect," and recommended that the matter be dismissed. The Board of Governors of the State Bar held a hearing at which petitioner addressed the board and answered questions. The board admitted in evidence a letter submitted by petitioner, reviewed the record before the local administrative committee, and found petitioner guilty as charged on all six counts. The board recommended that petitioner be suspended from the practice of law for a period of one year.. Three members dissented on the ground that the degree of discipline recommended was insufficient. In fixing the degree of discipline to be recommended, the board took into consideration petitioner's past record, which included a disciplinary proceeding entitled "L.A. 1276—In the Mat-

ter of Oliver O. Clark, Attorney at Law (Dr. L. C. Burwell, complaining witness)," in which the board on August 5, 1949, publicly reproved petitioner.

Petitioner contends that there is no evidence to support the findings of the board. ■ The findings of fact by the local administrative committee and the board are not binding upon this court, and upon review of a recommendation for suspension or disbarment we pass upon the sufficiency and weight of the evidence. (*Fleming* v. *State Bar*, 38 Cal. 2d 341, 342 [239 P.2d 866] ; *Fall* v. *State Bar*, 25 Cal.2d 149, 159 [153 P.2d 1].) ■ The burden is on petitioner, however, to show that the recommendation of the board is erroneous or unlawful. (*Alkow* v. *State Bar*, 38 Cal.2d 257, 258 [239 P.2d 871].)

The six counts in this proceeding all arise from petitioner's conduct as guardian of the estate of one George W. Bigelow, an incompetent. Petitioner was appointed guardian on August 30, 1943, and continued in that capacity until the death of his ward, December 21, 1948. Petitioner was subsequently appointed executor of Bigelow's estate.

Petitioner filed his first annual account on December 16, 1944, and the account was approved by the court. Thereafter no accounts were filed, and on April 13, 1948, the surety on petitioner's bonds petitioned the court for an accounting. Petitioner thereafter filed his second account on July 28, 1948, which was not approved. An amended second account was filed on November 22, 1948, but was ordered off calendar following Bigelow's death. On March 1, 1949, petitioner filed a final account, approval of which was denied by the court with instructions to file a new account for the entire period of the guardianship. On May 23, 1949, a certified public accountant was appointed as a referee to examine petitioner's records. On August 29, 1949, the referee reported a cash shortage of $2,131.12 in the guardianship funds.

The court found that petitioner had overcompensated himself and the estate's attorney (petitioner's son-in-law), and had made other unauthorized expenditures, totalling $5,145. The court also ordered petitioner to bear the costs of appointing the referee, $1,100. Petitioner was thus surcharged for the cash shortage of $2,131.12, the unauthorized expenditures of $5,145, and the costs of appointing the referee, $1,100, or a total of $8,376.12. The final account was approved on that basis. The amount surcharged was repaid by petitioner and not by the bonding company.

■ It should be noted at the outset that the fact that petitioner and Bigelow occupied the relationship of guardian and ward, and not that of attorney and client, would not preclude disciplinary action. ■ As guardian petitioner occupied a position demanding of him the highest degree of diligence and good faith. (Prob. Code, § 1400; *Guardianship of Carlon*, 43 Cal.App.2d 204, 208 [110 P.2d 488].) ■ He was an officer of the court until discharged from his guardianship. (*Guardianship of Reynolds*, 60 Cal.App. 2d 669, 677 [141 P.2d 498].) He took an oath that he would execute the duties of his trust. (Prob. Code, § 1480.) ■ When an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be disciplined for his misconduct. (Bus. & Prof. Code, § 6106; *Petersen* v. *State Bar*, 21 Cal.2d 866, 870 [136 P.2d 561]; *Flaherty* v. *State Bar*, 16 Cal.2d 483, 489 [106 P.2d 617]; *Lyders* v. *State Bar*, 12 Cal.2d 261, 265 [83 P.2d 500]; *Jacobs* v. *State Bar*, 219 Cal. 59, 64 [25 P.2d 401]; see 7 C.J.S., Attorney and Client, § 19.)

*Count One.* The board found that petitioner "commingled money belonging to George W. Bigelow, an incompetent person, with his own money or personal effects." The money referred to, at least $1,400, was received by petitioner in May, 1946, after sale of a lot owned by the ward. After the referee completed his audit and reported a discrepancy in the guardianship accounts, petitioner produced the money. According to petitioner, the money, in fifty and hundred dollar bills, had been placed in a large envelope with the words "Bigelow Estate" in pencil across the front. The envelope was placed in a locked metal box in petitioner's office, which also contained documents and money of clients in separately marked envelopes and petitioner's own money and documents. Petitioner did not have a personal bank account. The envelope remained in the box, and the money was not deposited in the guardianship account for Bigelow. Petitioner explains his failure to deposit the money on the ground that he forgot to leave his secretary a memorandum instructing her to deposit the funds and that the money remained in the box for over three years through his oversight. He states that he found the missing money "after the report of the referee in this matter, approximately two weeks later when it became plain to me that the discrepancy was due to the accounting of the money received from the Maywood lot."

Petitioner's explanation does not set at rest suspicions aroused by his conduct. He was requested to produce the envelope in which he stated that the money was placed, but did not do so. He did not call his secretary as a witness to corroborate his testimony. He could not account at the hearing for the amount of money that he allegedly found in the envelope, yet he knew when he found the money that he was under investigation, that a shortage had been discovered in his accounts, and that he would undoubtedly be called upon to show that he had not misappropriated the missing money.

These facts must be viewed in the light of petitioner's background. ■ As a fiduciary, the law imposed upon him the strictest duty of prudent conduct. Petitioner has practiced law in California since 1907. Because he is a man of superior intellect and wide experience,[1] his conduct is less excusable than might otherwise be the case. ■ An attorney "must perform his duties to the best of his individual ability." (*Friday* v. *State Bar,* 23 Cal.2d 501, 505 [144 P.2d 564].) Against petitioner's version of the facts, we must balance evidence definitely showing that petitioner sold his ward's property for cash, that he failed to deposit the money in the guardianship account, that over three years later a referee's report divulged a shortage in funds, that the court and surety demanded that petitioner make up the shortage, and that then, but only then, petitioner produced the missing money with an explanation that tests credulity.

The board contends that petitioner's testimony establishes commingling on the theory that the offense was committed when petitioner placed the envelope containing his ward's money in the same safe with his own money. ■ Rule 9[2] of the Rules of Professional Conduct (33 Cal.2d 30) does not define commingling, but the decisions establish that com-

---

[1]The record contains a letter from John W. Preston, formerly a member of this court, stating: "I think I can fairly appraise the mental make-up of Mr. Clark. He is in many respects a unique character. He has a trip hammer intellect and a superior power of expression. He is dynamic and overflowing with energy filled with hopeful enthusiasm. He is a sound lawyer of very wide experience. He daily overschedules himself and as a consequence oftentimes omits or neglects material acts. But he is not dishonest. On the contrary, he is thoughtful and considerate of the rights of others. If he could he would redeem every pledge he has made."

[2]"A member of the State Bar shall not commingle the money or other property of a client with his own; and he shall promptly report to the client the receipt by him of all money and other property belonging to such client."

mingling is committed when a client's money is intermingled with that of his attorney and its separate identity lost so that it may be used for the attorney's personal expenses or subjected to claims of his creditors. (*Bennett* v. *State Bar,* 27 Cal.2d 31, 36 [162 P.2d 5]; *Griffith* v. *State Bar,* 26 Cal.2d 273, 276-277 [158 P.2d 1]; *Narlian* v. *State Bar,* 21 Cal.2d 876, 884-885 [136 P.2d 553]; *Peck* v. *State Bar,* 217 Cal. 47, 51 [17 P.2d 112].) ▆▆▆ When the client's money is kept apart from that of the attorney, rule 9 is not violated. (*Townsend* v. *State Bar,* 36 Cal.2d 631, 633 [226 P.2d 581].) Accordingly, if petitioner at all times kept his ward's money in a separate envelope in his safe, with his ward's name plainly marked on the envelope, the money was not commingled with petitioner's own money, within the meaning of rule 9.

▆▆▆ Whether or not the charge of commingling can be sustained thus depends on whether or not we accept as true petitioner's testimony that he placed the money in his safe in a large envelope marked ''Bigelow Estate.'' In view of the seriousness of the alleged offense and the lack of direct evidence of commingling, we have decided, as did the local committee, to give petitioner the benefit of doubts that might reasonably be entertained as to his credibility, and to accept his testimony as true. We therefore conclude that the charge of commingling has not been proved.

Even though the offense of commingling was technically not committed, many of the dangers that accompany violation of rule 9 are present here. ▆▆▆ The rule against commingling ''was adopted to provide against the probability in some cases, the possibility in many cases, and the danger in all cases that such commingling will result in the loss of clients' money. Moral turpitude is not necessarily involved in the commingling of a client's money with an attorney's own money if the client's money is not endangered by such procedure and is always available to him. However, inherently there is danger in such practice for frequently unforeseen circumstances arise jeopardizing the safety of the client's funds, and as far as the client is concerned the result is the same whether his money is deliberately misappropriated by an attorney or is unintentionally lost by circumstances beyond the control of the attorney.'' (*Peck* v. *State Bar,* 217 Cal. 47, 51 [17 P.2d 112].) ▆▆▆ Of course, an attorney may properly place his ward's money in his safe for a short period of time to safeguard it until he has time to deposit it in a bank. But when an attorney keeps a large sum of his ward's money

in his safe for over three years and loses track of its whereabouts, the evils described in the Peck case are clearly present. Petitioner, according to his own version of the facts, was guilty of gross negligence in the handling of his ward's funds.

 *Count Two.* The board found that petitioner failed "to include the sum of $1,851.29 in his accounting to the court, and that said omission was intentional and wilful."

The sum referred to is the money that petitioner stated that he found in the envelope shortly after the report of the referee. Of this sum, at least $1,400 was from the real estate transaction referred to in Count One. Petitioner stated at the hearing that he did not know the source of the balance of the money, but the report of the referee indicates that the money was derived either from the sale of the real property or from the sale of 18 shares of stock that belonged to the ward. The record contains petitioner's "Complete and Final Account of Guardian for Full Period of Guardianship— August 30, 1943 to December 22, 1948," filed on March 1, 1949. In his listing of estate assets, the only reference by which the money in question could be traced is an entry, "Accounts Receivable, $1,788.02." There is no further explanation of this entry, and the name of the debtor or debtors of the estate is not given. The only entries under "Total Cash" are deposits in three guardianship accounts totalling $4,430.28. In another part of the account, under the title "Monies Received During Guardianship," petitioner lists "net from sale of lot and water shares, $3,788.02."[2a]

The account thus states the amount for which the ward's property was sold, but fails to reveal that part of this money was in the possession of petitioner and not deposited in the bank. If petitioner knew at the time he filed his final account in March, 1949, that the money had not been deposited in the bank, his defense to the charge of commingling, that he did not know the money had not been deposited until after the report of the referee in August, 1949, could not be true. If it is not true, and petitioner knew that the money had not

---

[2a]The amount of the shortage, $1,851.29, differs from the amount for which the ward's property was sold because $2,000 of the money received from the sale was paid immediately to the nurse that cared for the ward. From the referee's report it appears that the other $1,788.02 was placed in the envelope. The record does not disclose the source of the remaining $63.27 in the envelope. Petitioner testified that he placed $1,400 of the money received from the sale in the envelope. Under his version of the facts, he thus cannot account for $451.29 of the $1,851.29 in the envelope.

been deposited, Count Two is supported by the evidence, for it was petitioner's duty to disclose in his final account that he was the debtor for the amount entered under ''Accounts Receivable.'' (See Civ. Code, §§ 2228, 2229, 2233; *Bone* v. *Hayes*, 154 Cal. 759, 766 [99 P. 172].) On the other hand, assuming, as we did under Count One, that petitioner was telling the truth when he told the administrative committee that he ''assumed always that the deposit had been made,''[3] the evidence again supports Count Two. If the money had been deposited, it should have appeared in the account under ''Total Cash'' deposited in the bank. What then could petitioner have meant by his entry of $1,788.02 under ''Accounts Receivable''? When pressed for an explanation before the administrative committee, he stated, ''I thought that the difference represented by that account receivable was a difference that had probably occurred in the transmission of monies from the general account of the guardian to the trustee account of Mrs. Gosman [the nurse who cared for the ward].'' This explanation is unacceptable since the slightest investigation would have revealed that the money was not in Mrs. Gosman's trustee account. If petitioner had lost track of the money, it was his duty to reveal that fact to the court. The entry of $1,788.02 under ''Accounts Receivable,'' however, would naturally mislead the court into believing that that sum was due to the estate from some unnamed debtor, such as money due from the sale of the ward's property. We cannot escape the conclusion that the entry was made to make the books balance and conceal the fact that petitioner's gross negligence had caused him to lose track of a large sum of his ward's money.[4] The finding of the board under Count Two thus has adequate support in the evidence.

---

[3]In defending the charge of commingling, petitioner stated ''I assumed always that the deposit had been made,'' and that he found the money in his safe ''about two weeks'' *after* the referee's report. The record, however, contains a letter written by petitioner to the referee on August 16, 1949, 13 days *before* the report, stating that the $1,788.02 accounts receivable entry represents proceeds from the sale of the real property ''not deposited at the date of sale.''

[4]The account was actually prepared by one Ralph Ritchie, an accountant who, of course, could prepare the account only from data supplied by petitioner. Further, the account contained the following affidavit of petitioner: ''That he is the Guardian who makes the foregoing account and report; he has read the foregoing Complete and Final Account of Guardian for Full Period of Guardianship—August 30, 1943 to December 22, 1948; all the statements therein are true of his own knowledge, except as to those matters stated on information and belief and as to those matters he believes them to be true.''

 *Count Three.* The board found that petitioner "did without order or authorization of court withdraw as guardian fees on the dates and amounts as follows," listing nine withdrawals between December, 1944, and December, 1947, amounting to $3,350. Petitioner conceded that he made the withdrawals as compensation without prior court approval, stating that "it was my understanding that in a guardianship matter, the guardian, subject to the approval of the court later, had the right to compensate himself reasonably from time to time out of the guardianship funds."

Section 1556 of the Probate Code provided at the times involved in this proceeding that a guardian "shall have such compensation for his services as the court in which his accounts are settled deems just and reasonable." In 1951 section 1556 was amended.[5] Before this amendment it was held that the guardianship fee could be claimed as an item of account and paid as such without the formality of a petition to the superior court and a special order or decree. (*Estate of Eaton,* 38 Cal.App.2d 180, 184 [100 P.2d 813].) The question whether guardianship fees were excessive could be determined upon settlement in the trial court of the guardian's account and reviewed upon appeal from the order settling the account. (Prob. Code, § 1630.) Petitioner, therefore, could compensate himself from the guardianship estate without prior court approval, subject to the condition that the amount thereof found by the court to be excessive must be returned to the estate. Of course, if the withdrawals were in bad faith, and were misappropriations of estate funds instead of compensation, a different problem would be presented. The board does not contend that the withdrawals here were in bad faith.

We conclude, therefore, that the third count is unsupported by the evidence.

---

[5] "At any time after the filing of the inventory and appraisement, but not prior to the expiration of three months from the issuance of letters of guardianship, any guardian may petition the court for an order fixing and allowing his compensation for services rendered to that time. . . . Upon the hearing the court shall make an order allowing such compensation to the guardian for services rendered to the estate of his ward . . . as the court may deem proper, and compensation so allowed shall thereupon be charged to the estate of the ward." As amended section 1556 is substantially similar to Probate Code, section 904, providing for allowance of commissions to executors and administrators. Under section 904 an executor or administrator is not entitled to his commissions until after court approval. (*Estate of Jones,* 166 Cal. 147, 152 [135 P. 293]; see *Estate of Carter,* 132 Cal. 113, 114 [64 P. 123, 484]; *In re Rose,* 80 Cal. 166, 180 [22 P. 86].)

*Count Four.* The board found that petitioner, without prior authorization of the court, withdrew attorney's fees amounting to $1,300. Petitioner's son-in-law was the attorney for the estate. The foregoing discussion regarding the third count is applicable here. (*Cf.* Prob. Code, § 1556.1, enacted in 1951.)

*Count Five.* The board found that on October 18, 1949, petitioner testified before Judge Paonessa in the Superior Court of Los Angeles County and intentionally misled the court by not revealing that $1,800 in petitioner's safe belonged to the guardianship estate. The $1,800 referred to included the $1,400 involved in Count One and another $400 that was apparently the proceeds from another sale of estate property. The testimony before Judge Paonessa is in the record. It there appears that counsel for the bonding company was allowed to question petitioner "as to his ability to make up" the shortage in his accounts revealed by the referee's report. Petitioner said that "within three days I will pay it all in." He further stated that he had "other money" in his safe, "approximately $1800," and "when the Court makes the order, I will put in the full amount." Counsel for the surety replied, "I have had your word before, and I would rather have it before the Court, if it is possible." The charge in Count Five is based on the fact that petitioner did not expressly inform the court that the money in his safe belonged to the guardianship estate. The questions by the attorney for the surety, however, were directed only to the issue whether petitioner could repay the shortage in his accounts and thus relieve the surety of liability on its bond. Petitioner was never directly asked whether the money in the safe was his money or guardianship money. Accordingly, it cannot be said that petitioner intentionally misled the court, and the finding of the board does not have adequate support in the record.

*Count Six.* The board found that petitioner failed "to file within a reasonable time, or at all, until ordered to do so by the court, an account as guardian of the estate of George W. Bigelow, that the account filed by respondent was incomplete, inaccurate, and misleading. That the failure of respondent to file a proper account necessitated an independent audit to be made by the court; that said audit established that respondent did not entirely account for all moneys received and in possession of the respondent as guardian of the said estate."

Petitioner did not file an inventory and appraisement of the guardianship estate until April 6, 1949, more than five years after his appointment, although Probate Code, section 1550, requires the inventory and appraisement to be filed within three months of the appointment. Petitioner concedes that he did not comply with section 1550, but claims that he complied with section 1553, providing that "At the expiration of a year from the time of his appointment, and as often thereafter as he may be required by the court, the guardian must present his account to the court for settlement and allowance." After petitioner filed his first account in December, 1944, more than one year after his appointment, he did not file an account until, following petition of his bonding company, he was cited to show cause why he should not file an accounting. Petitioner thereafter filed an unacceptable current account and an unacceptable final account. It became necessary to appoint a referee to audit petitioner's records.

A guardian does not comply with section 1553 when he presents an account so inaccurate that investigation by a referee becomes necessary. (See *Purdy* v. *Johnson,* 174 Cal. 521, 527 [163 P. 893].)

The finding of the board is clearly supported by the evidence. Petitioner testified that "I am not attempting to exculpate myself for being negligent, but I don't think it was gross negligence." We disagree. The money from the real estate transaction might never have been discovered without the investigation. Petitioner admitted that he completely lost track of the money for "about three and a half years." Petitioner justified his conduct by testifying, "I know previously I have been asked if it didn't strike me as rather peculiar that my account should be $1,800, or any amount, less than what it ought to be, but, you see, I have never personally handled the matters of deposit of my monies or keeping of records. Always that has been done by somebody else, and I am not an accountant and didn't presume to carry in my mind how much money the estate was supposed to have on hand. It is probably careless of me to have done that, but nevertheless that is the way the matter came to pass."

A guardian may properly employ an accountant to perform acts involving professional skills not possessed by the guardian, but he may not delegate all responsibility. (See *Purdy* v. *Johnson, supra*; Scott on Trusts, §§ 171.2, 172.) Petitioner had the duty to make a reasonable check on the entries in the final account as prepared by the accountant.

The account contains his statement that he had read the account and that the statements therein were either true to his own knowledge or that upon information and belief he believed them to be true. But the account, described under Count Two, above, was confused and incoherent. His submission of the account to the court, without any attempt to ascertain if it had revealed the true state of affairs, significantly demonstrates petitioner's general conception of his professional obligations. "The purpose of keeping proper books of account, vouchers, receipts, and checks is to be prepared to make proof of the honesty and fair dealing of attorneys when their actions are called into question, whether in litigation with their clients or in disciplinary proceedings and it is a part of their duty which accompanies the relation of attorney and client. The failure to keep proper books . . . is in itself a suspicious circumstance." (*Matter of O'Neill,* 228 App.Div. 518, 520 [240 N.Y.S. 183] ; see *Bruns* v. *State Bar,* 18 Cal.2d 667, 672 [117 P.2d 327].) In filing an incomplete, inaccurate, and misleading account petitioner was guilty of gross negligence in the performance of his duties as guardian and as an attorney.

*Discipline.* A consideration of petitioner's conduct leads to the conclusion that this case reflects much more than the innocent inadvertence of a busy attorney, which petitioner suggests as an explanation justifying his actions. Petitioner intentionally included a large sum of money in his final account to the court under an entry designed to mislead the court (Count Two), and he was guilty of acts of gross negligence in his performance of his duties as guardian. (Counts One and Six.)　The presentation to the court of an account that petitioner knew to be misleading was a ground for disciplinary action. (Bus. & Prof. Code, § 6068(d) ; *Pickering* v. *State Bar,* 24 Cal.2d 141, 144-145 [148 P.2d 1].)　Gross negligence is a breach of the fiduciary relationship that binds an attorney to the most conscientious fidelity to the interests of his client. (*Stephens* v. *State Bar,* 19 Cal.2d 580, 583 [122 P.2d 549] ; *Waterman* v. *State Bar,* 8 Cal.2d 17, 20 [63 P.2d 1133].) It warrants disciplinary action, since it is a violation of his oath to discharge his duties to the best of his knowledge and ability. (Bus. & Prof. Code, §§ 6067, 6103 ; *Stephens.* v. *State Bar, supra; Trusty* v. *State Bar,* 16 Cal.2d 550, 553 [107 P.2d 10] ; *Waterman* v. *State Bar, supra.*) In determining the proper degree of discipline, petitioner's prior disciplinary record may be considered. (*Herron* v.

*State Bar*, 24 Cal.2d 53, 65 [147 P.2d 543].) In arriving at its recommendation of a suspension for one year, the Board of Governors relied upon three counts (Three, Four and Five), which are not supported by the evidence, and upon Count One, which was proved in a lesser degree than that relied upon by the board. We have concluded that petitioner will be sufficiently punished if he is suspended from the practice of law for six months.

It is ordered that Oliver O. Clark be suspended from the practice of law for a period of six months, commencing 30 days after the filing of this opinion.

CARTER, J.—I dissent.

Although petitioner was charged with six separate counts of having violated his duties as an attorney, they all arose out of the same transaction, that is, his conduct as the guardian of the estate of George W. Bigelow, an incompetent. The local administrative committee found that his alleged misconduct amounted only to carelessness in handling and keeping records of the assets of the estate. The majority opinion determines that the third, fourth and fifth counts are not supported by the evidence. Counts one, two and six are held to establish ''gross negligence'' on petitioner's part, thus justifying discipline. I do not agree with this holding for three reasons: (1) Negligence, ordinary or gross, is not a proper ground for disbarment or suspension of a member of the State Bar. (2) Even if it is, it must be negligent conduct of an attorney toward his client in handling the client's business. It does not apply where there is no attorney-client relationship between the attorney and the one toward whom he is negligent as we have here. (3) The evidence does not establish gross negligence.

On the first point I have previously expressed myself in *Stephens* v. *State Bar*, 19 Cal.2d 580, 585 [122 P.2d 549]; *Trusty* v. *State Bar*, 16 Cal.2d 550, 554 [107 P.2d 10] and *In re McKenna*, 16 Cal.2d 610, 612 [107 P.2d 258]. In addition I wish to point out that negligence in the handling of his client's affairs is not grounds for disbarment of an attorney in a majority of the states. (See cases collected, 7 C.J.S., Attorney and Client, § 23, p. 744; 5 Am.Jur., Attorneys at Law, § 268, p. 423.)

The majority in this case goes a step further, however, which brings me to the second point. It holds that the attorney may be suspended when the negligence occurs while

he is acting in a capacity other than as an attorney; where he is negligent with respect to his dealings with a third party, not a client. In the instant case petitioner was the *guardian* of the estate of an incompetent. He *was not* the attorney for the estate or incompetent. The latter and petitioner had an attorney. It is true that a fiduciary relation exists between a guardian and his ward but his duty is only such as should be exercised by a man of ordinary prudence in the management of his own business. (*Estate of Wood*, 159 Cal. 466 [114 P. 992, 36 L.R.A.N.S. 252]; *Estate of Boyes*, 151 Cal. 143 [90 P. 454].) And it has been held that mismanagement of another trust estate is not ground for removal as guardian of the estate under consideration. (*Heath* v. *Maddock*, 81 N.J.Eq. 469 [86 A. 945], affd. 82 N.J.Eq. 366 [91 A. 1069].) Likewise an attorney should not be disbarred because, while acting as a guardian but not as attorney, he is guilty of mismanagement of his ward's estate. Because an attorney is a poor businessman in his dealings with another's property, of which he has control, but not as an attorney, should not be ground for disbarment and the majority opinion cites no case so holding.

There are many ramifications to the rule stated by the majority. The husband is the manager of the community property and he and his wife's relations are fiduciary. Would it be said that whenever the husband happens to be an attorney, a careless handling of the community property will be a ground for his discipline as an attorney? The majority would say that it could be. Likewise, the secretary or treasurer of a club or corporation is careless in keeping its records and handling its funds, may be disbarred if he is an attorney; an attorney who borrows an automobile from a friend, not a client, and his grossly negligent operation of it results in its destruction, is subject to disbarment; a guardian who is also an attorney but not for his ward's estate, is grossly negligent in the care of the property of his ward in an automobile and it is consumed by fire, may be disbarred; an attorney who is the guardian of the person of his ward but not as attorney, would be exonerated as to damages for any conduct, short of wilful misconduct or intoxication, in driving a vehicle causing injury to his ward, but he could be disbarred for such conduct. These and many more examples could be given which emphasize the vice of the holding of the majority opinion. The majority also point to the impracticability of requiring an attorney to be a superman,

not only in his relations with his clients, but also with third persons.

Gross negligence conveys no connotation of intentional misconduct, wilfulness or intent to injure (*Robertson* v. *Brown,* 37 Cal.App.2d 189 [99 P.2d 288]; *Sumner* v. *Edmunds,* 130 Cal.App. 770 [21 P.2d 159]; *Meek* v. *Fowler,* 3 Cal.2d 420 [45 P.2d 194]; *Browne* v. *Fernandez,* 140 Cal. App. 689 [36 P.2d 122]), but it is "the want of that care and diligence which even careless, thoughtless, or inattentive persons are accustomed to exercise; the failure to take such care as a person of common sense and reasonable skill in like business but of careless habits would observe in avoiding injury to his own person or life under circumstances of equal or similar danger. It is very great negligence; negligence materially greater than ordinary negligence, the difference being one of degree, although sometimes it is said to be a difference of kind; negligence of an aggravated character; and gross failure to exercise proper care. The term implies a thoughtless disregard of consequences without exerting any effort to avoid them; an indifference to the things or welfare of others. It refers to conduct which is positive or affirmative rather than merely passive or negative." (65 C.J.S., Negligence, § 8d, p. 370.) Here, as stated in my third point, the evidence was not sufficient to establish any intentional misconduct nor gross negligence.

On count one the board found petitioner guilty of commingling funds where he placed the ward's money in a separate envelope in his safe. The majority opinion correctly holds that there was no commingling of funds. The money was produced by petitioner from the envelope where it had been all the time. It had remained there three years but there was no showing of any misappropriation of it or intent to do so, and the ward was not injured by its being so kept. Yet the majority arrives at a finding of gross negligence because petitioner's explanation does not set at rest "suspicions" and it "tests credulity," and that the evils inherent in commingling are present where petitioner keeps the money in his safe for three years and forgets its presence there. Disciplinary matters are not and should not be decided on "suspicions." The only evidence shows that the money was there at all times, was never misappropriated and was always a part of the ward's estate. If the money had been deposited in the bank in petitioner's name as guardian for three years

but was forgotten, it would not be called gross negligence. At most it would be ordinary negligence.

The second count deals with a failure of petitioner to include some $1,800 in his accounting. That was the same money that was in the envelope, and the same comments are applicable to it as were made with respect to the first count. Naturally he could not list it in the account if he had forgotten about it. There is no proof of any intent to misappropriate it and it was not misappropriated. The inadvertent omission of one asset of a ward's estate from the guardian's account can hardly be said to constitute ordinary negligence, much less gross negligence.

The sixth count deals with the failure to file an account as guardian until ordered by the court, and that the account filed was inaccurate and necessitated an independent audit. Petitioner did file an account after his appointment. If it was inaccurate, that was nothing more than negligence, as conceded by petitioner. It was not gross negligence. The account was filed and the ward was not injured. Certainly it cannot be said that such conduct constituted a failure to exercise the care a person of careless habits would exercise or gross negligence.

In my opinion the record in this case does not disclose any conduct of petitioner which can be said to even remotely justify discipline, and I would therefore dismiss the proceeding against him.