[S. F. No. 19242. In Bank. Oct. 21, 1955.]

EMMETT R. BURNS, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Emmett R. Burns, in pro. per., and Eugene H. O'Donnell for Petitioner.

William E. Mussman and Garrett H. Elmore for Respondent.

THE COURT.—In response to a writ of review, the Board of Governors of The State Bar has presented the record of the proceeding which is the basis of its recommendation that Emmett R. Burns be disciplined by suspension from the practice of law for six months.

The charges of professional misconduct grow out of Burns' representation of John H. Crumley in a personal injury action. Crumley engaged as his attorney one Sibbett, who negotiated a settlement. Crumley rejected it and employed Burns, who agreed with Sibbett to divide equally with him

the amount of the contingent fee after deduction of certain costs.

A settlement was reached and Crumley executed a release. Burns then received two checks in the aggregate amount of $16,400, made payable to ''John Crumley and Emmett R. Burns, his attorney.'' Pursuant to contractual authority, Burns indorsed the checks with both names. On the following day, the checks were deposited in a bank account to the credit of ''Alyce Burns or Emmett R. Burns Trustee Account.''

The record includes evidence tending to prove these facts:

Crumley was not notified by Burns of the settlement. He found out about it from another source about a month after the checks had been delivered. During that time he had tried unsuccessfully to find Burns at his office. He then went to The State Bar and the district attorney and, on the advice of the latter, sent a registered letter of inquiry to Burns. In it, he stated that he had consulted the district attorney, that he had been advised that he should have been paid within a few days after he signed the release and, if payment were not made ''within the near future,'' he would take legal action.

A few days later Burns talked with Crumley by telephone and said that the delay in payment was occasioned by the press of litigation in another city. Burns also told Crumley that he should not have gone to the district attorney.

By agreement Burns and Crumley later met and discussed the amount of the fee to be paid. Crumley then said that, according to his understanding of the agreements which had been made, Sibbett was entitled to one-fourth of the amount originally offered in settlement, Burns to receive one-third of the difference between that amount and the one ultimately accepted. According to Burns, Crumley insisted he was obligated to pay only one-third of the difference between these two amounts.

Burns rejected this proposal, stating that such an arrangement would be contrary to their written contract and also to the one he had made with Sibbett. Because he had recently moved his office, he told Crumley, his records were disarranged and he was unable to produce copies of the agreements. However, in Crumley's presence, he telephoned to Sibbett who read to them from his copy of his contract with Burns.

Burns and Crumley agreed to meet a week later at Sibbett's office but Burns did not appear. A day or two after-

ward, Crumley received a telephone call from Burns who set a date for a later meeting. At that meeting he accepted a postdated check of Burns for $12,000. However, before the date of this check, Burns called him by telephone and said that the check had been made out improperly. He asked Crumley to meet him a few days later to receive a different one. In the meantime, said Burns, he would try to get Sibbett to reduce his fee.

At their next meeting, Crumley accepted a postdated check for $12,500, in exchange for the one he then held. Burns told him that he would be notified when the money was in the bank. Before the date of this check, Crumley received another telephone call from Burns, who told him that there was some question about the validity of the check because it had been written on a Sunday and he should exchange it for another one. Crumley consulted the bank in which he had his account and was advised that the check would be honored if sufficient funds were on deposit. He placed it with the bank for collection and it was paid. This was exactly three months after Burns received the money.

Other testimony in more detail may be summarized as follows:

According to Burns, at their first meeting after the settlement was made, he offered to give Crumley his check for $16,400, less costs, but Crumley refused to accept it. Crumley denied that any such offer had been made to him. The record shows that on the day Burns claims to have made the offer, he had only $39.86 to his credit in the bank.

Burns told the local committee that he gave Crumley only one check, for $12,500, and it was not postdated. He recalled the date, he said, because Crumley had discussed with him a purchase of cattle from a livestock show which was then in progress. However, in the hearing before the Board of Governors, Burns was asked: "If you had money available, why did you give *a post-dated check?*" (Emphasis added.) He explained that it was because he had not yet cleared the matter of Sibbett's fee. "That was the whole thing. And until that final point was settled I told him not to cash the check, not to put it through." Again he was asked: "Why did you *on two occasions* give him *post-dated checks* if you had money available?" (Emphasis added.) He replied: "Well, *the checks* were given by Mrs. Burns and signed by her. At the time when *the checks* were given to him the

dispute with Sibbett had not been settled.'' (Emphasis added.)

In his testimony, Sibbett described the substitution of attorneys and his fee arrangement with Burns and stated that he first learned of the settlement about one week after payment was made. He wrote to Burns about his share of the fee and inquired of him by telephone thereafter two or three times at intervals of ''a month or two.'' When Burns asked if he would consent to a reduction in fee, he said that he would not be unreasonable. Later he and Burns each agreed to reduce the amount of the fee provided by their contract. Sibbett was paid by Burns in cash five months after the settlement was made.

Bank statements disclose that immediately prior to the deposit by Burns of the check for $16,400, the balance of the ''Alyce Burns or Emmett R. Burns Trustee Account'' was $1,475.35. Within the next two and one-half months, some 30 checks drawn on the account were paid. On the day of the deposit, the bank paid checks totalling $4,350. Within a week, withdrawals in excess of deposits had reduced the balance to $5,504.20, and about two months later it had fallen to $3.36. Shortly thereafter Burns made two deposits, one of $3,500 and another of $13,134. Burns told the Board of Governors that the latter one was in the form of a check, but he did not know whether it was ''a fee or repayment of a loan or something like that.''

Burns testified that the settlement checks were deposited by his wife, who acted as his bookkeeper and handled all of his financial transactions; she ''knew where to deposit them.'' According to him, he had explained to his wife that the purpose of the trustee account was to receive settlement moneys, which he considered to be trust funds. He said that although he did not recall giving her specific instructions that the balance of the account should never fall below the aggregate of trust obligations, he directed her to use for their personal needs only money to which they were entitled.

However, Burns admitted that funds on deposit in his one bank account were never segregated as to personal moneys and trust funds or to his obligations to individual clients. Money from all sources was deposited in the account, and from it were withdrawn expenses of trial preparation, advances to clients and disbursements for personal expenses. No record was maintained which showed either aggregate or individual trust obligations.

Burns claims to have kept at either his office or his home

a cash reserve fund of five or six thousand dollars, "in various denominations," from which to advance costs of litigation and "to be available for anything that might come up, any particular reason I would have to pay for anything." At one time, he said, it had been kept in his office safe, but for the five or six years preceding the disciplinary hearings it was left at his home in a location described variously as "in the cash box in the filing cabinet—locked filing cabinet," "the file, into a drawer," and "in a room by itself. It's a room with a locked door. It's in the bathroom. I have a cabinet. It's a steel cabinet in a steel box, and it's behind a locked door."

The local committee found that Burns was guilty of "violations of Sections 6103, 6067, 6068 and 6106 of the Business and Professions Code" and rule 9 of the Rules of Professional Conduct in that he appropriated for his own use funds belonging to Crumley and commingled those funds with his own. By a vote of 10 to 5, the Board of Governors approved and adopted the findings of the local committee and made the additional finding that the appropriation and commingling were done wilfully, and that Burns wilfully failed to report to Crumley his collection of the settlement moneys. The board unanimously adopted the recommendation that Burns be suspended from the practice of law for six months.

In a proceeding to review the board's decision, "the burden is upon the petitioner to show wherein the decision is erroneous or unlawful." (Bus. & Prof. Code, § 6083; *Alkow* v. *State Bar*, 38 Cal.2d 257, 258 [239 P.2d 871].) Except for insinuations as to the integrity of the complaining witness and of bias on the part of the members of the Board of Governors, the brief presented by Burns in support of his petition consists mainly of a general assertion that the findings are unsupported. He contends that they ignore "the real issue" and disregard "approximately ninety per cent (90%) of the testimony"; but he does not state "the real issue," and the testimony recited by him, which amounts to only a small part of that presented, is entirely consistent with the findings.

The evidence, including Burns' own admissions, fully supports the conclusion that, contrary to rule 9 of the Rules of Professional Conduct,[1] he commingled trust funds with

---

[1] "A member of the State Bar shall not commingle the money or other property of a client with his own; and he shall promptly report to the client the receipt by him of all money and other property belonging to such client."

personal funds. (*Cf. Peck* v. *State Bar*, 217 Cal. 47, 51 [17 P.2d 112].) The record also fully supports the finding that Burns wilfully appropriated his client's funds to his own use. One basis for such a finding is the evidence that he delayed unreasonably turning over the settlement moneys to Crumley. (*Cf. Price* v. *State Bar*, 8 Cal.2d 201 [64 P.2d 727].) The board might also have based its determination upon the conduct of Burns in allowing his wife to make use of the funds for their personal purposes. The evidence in that regard reasonably shows that Burns took undue advantage of his client. (*Cf. Roark* v. *State Bar*, 5 Cal.2d 665, 667 [55 P.2d 839]; *Laney* v. *State Bar*, 7 Cal.2d 419, 422 [60 P.2d 845]; *Stanford* v. *State Bar*, 15 Cal.2d 721, 728 [104 P.2d 635].)

As excusing the delay, Burns contends that during the three-month period in which payment of the settlement money was withheld, he was engaged extensively in the preparation and trial of cases and that "the whole delay was over the fee." But according to his own testimony, he had no dispute with Sibbett. The only controversy was with Crumley and it arose in a conference between them more than six weeks after the settlement checks had been received and deposited by Burns in his account. In the meantime, Burns had used his client's money for his own purposes, and the local committee was fully justified in disregarding the weak, evasive and even conflicting testimony he gave in regard to large amounts of cash assertedly kept at his home or office. It is significant, in this connection, that the deposits made by Burns to meet his postdated check to Crumley were by check and not cash. Furthermore, it reasonably may be inferred from his giving of postdated checks that Burns used this means to gain the delay necessary for him to raise the money which he had misappropriated.

In an effort apparently directed toward showing bias and prejudice against him on the part of the members of the Board of Governors, Burns makes these arguments: He is engaged solely in the trial of personal injury litigation; such practitioners, "due to the insurance advertising," are looked at "askance"; the "prosecutor" was "of a large firm representing the 'interests'"; the board has, he believes, no personal injury attorney as its member, but all of them represent clientele "opposing" such practitioners. In conclusion, he argues that "the Court should know: 1. Was Mr. Crumley during these negotiations being advised by anyone in the State Bar? 2. When did he go to the State Bar?"

██ These contentions present no ground for setting aside the recommendation of disciplinary action; all are based on matters outside the record. ██ Furthermore, neither before the local committee nor before the Board of Governors did Burns raise the question of bias (*cf.* rule 15, Rules of Procedure of the State Bar) and if the issue had been raised, it is doubtful whether disqualification would justify setting aside the disciplinary proceeding. (*Cf. Fish* v. *State Bar*, 214 Cal. 215, 225 [4 P.2d 937].) In any event, a disqualification of the board members would not invalidate the proceeding before the local committee. (*Geibel* v. *State Bar*, 14 Cal.2d 144, 147 [93 P.2d 97].)

As discipline, the local committee and the board recommended suspension from the practice of law for six months. ██ Although in a disciplinary proceeding the findings of fact and recommendation of these bodies are accorded great weight, they "are not binding upon this court, which upon reviewing the recommendation for suspension or disbarment may, and always does, pass upon the sufficiency of the evidence." (*Fall* v. *State Bar*, 25 Cal.2d 149, 159 [153 P.2d 1] ; *Clark* v. *State Bar*, 39 Cal.2d 161 at 165 [246 P.2d 1].) This court will disregard the recommendation when it is disproportionate to the misconduct. (*Fleming* v. *State Bar*, 38 Cal.2d 341, 342 [239 P.2d 866].)

██ Burns' conduct, his evasive testimony and lack of candor before the board and the local committee are not consistent with the high degree of fidelity to his professional duties owed by an attorney at law. In his behalf, it may be said that he has been practicing since 1930; no prior charges stand against him. His client suffered no ultimate financial loss and the delay in making payment was only for three months. From a consideration of all of these circumstances we conclude that suspension from practice for a period of two years will meet the ends of justice.

The findings of the local committee and the board are fully supported and are approved. It is ordered that Emmett R. Burns be suspended from the practice of law in this state for a period of two years commencing 30 days after the filing of this opinion.

CARTER, J.—I dissent.

While I agree with the majority that the evidence is sufficient to support the findings of the local administrative committee and the Board of Governors that petitioner was

guilty of unprofessional conduct in his dealings with his client Crumley I am disposed to agree with the discipline recommended by both the administrative committee and the Board of Governors of six months' suspension rather than the two years' suspension fixed by the majority of this court.

This court has in numerous cases held that the local administrative committee is in a better position than either the Board of Governors or this court to evaluate the evidence and arrive at a conclusion as to what if any discipline should be imposed upon a member of the bar who is guilty of unprofessional conduct (*Browne* v. *State Bar, ante,* p. 165 [287 P.2d 745] (September 28, 1955)), and it seems appropriate to me that when the Board of Governors has approved the discipline recommended by the local administrative committee, this court should accept such recommendation in cases where the record is sufficient to justify discipline. I would therefore suspend petitioner from the practice of law for a period of six months.

Petitioner's application for a hearing by the Supreme Court was denied November 16, 1955, and the time for commencement of the period of suspension was extended to begin January 19, 1956. Carter, J., was of the opinion that the application should be granted.