[S. F. No. 19366.   In Bank.   Feb. 21, 1956.]

WILLIAM HIGGINS, Petitioner, v. THE STATE BAR
OF CALIFORNIA, Respondent.

Paul J. Philbin, Jr., for Petitioner.

Garrett H. Elmore for Respondent.

THE COURT.—This is a proceeding to review a recommendation of the Board of Governors of The State Bar that petitioner William Higgins be suspended from the practice of law for a period of six months.

Petitioner was charged with the violation of his oath and duties as an attorney at law in that he engaged others to solicit professional employment for him, commonly referred to as "ambulance chasing," in violation of rules 2 and 3 of the Rules of Professional Conduct. (33 Cal.2d 27.) After hearing, the local administrative committee found petitioner guilty as charged and recommended to the board his suspension from practice for four weeks. Petitioner failed to appear before the board and after a consideration of his case, the board made its own findings, which were in substantial agreement with the committee's but added that the improper "activities of the lay persons" acting on petitioner's behalf "were carried on with [petitioner's] knowledge, acquiescence and consent and were part of a scheme and design by [petitioner] to solicit professional employment." The board recommended a six months' suspension period, with three dissenting on the ground that "the degree of discipline recommended [was] too severe."

Petitioner, who is 32 years of age, was admitted to practice in January, 1951. He contends that the evidence is insufficient to sustain the board's findings and that, in any event, its disciplinary recommendation is too severe. While such findings are not binding on this court, which will itself pass upon the sufficiency and weight of the evidence (*Fall* v. *State Bar*, 25 Cal.2d 149, 159 [153 P.2d 1]; *Clark* v. *State Bar*, 39 Cal.2d 161, 165 [246 P.2d 1]), petitioner has the burden of showing wherein the decision of the board is erroneous or unlawful. (*Alkow* v. *State Bar*, 38 Cal.2d 257, 258 [239 P.2d 871].) He has not met that burden.

It appears that petitioner improperly solicited professional employment in two instances: one in September, 1953, from Mrs. Loma Porter following injuries to her child as the result

of an automobile accident; and the other in January, 1954, from Mr. and Mrs. Henry Augustus following injuries to their child, also as the result of an automobile accident.

With respect to the first charge, Mrs. Porter testified that about a week after her child was injured, two men called at her home, introduced themselves as investigators, gave her one of petitioner's professional cards, interviewed her at length about the accident, and had her sign a statement as well as a contract employing petitioner as her attorney but left no copy of either document with her. She further testified that petitioner called upon her about a week later, identified himself as "Mr. Higgins" and the two men who had previously visited her as "his investigators"; that she signed another contract with him; that he also interviewed her and took notes with regard to the accident; and that at no time between the interview by the two investigators and petitioner's visit had she undertaken to communicate with petitioner. Petitioner professed to be unable to remember any of these related events but claimed that he called on Mrs. Porter because a former client had told him of the accident to the Porter child, and that the mother "wanted some legal counsel." Mrs. Porter denied knowing the person who allegedly gave petitioner her name, and he was not called as a witness at the hearing. The Porter case was handled by petitioner and a settlement was concluded.

With respect to the second charge, Mrs. Augustus testified that on the day after her child was injured a "Mr. Jacobs" and another man came to her home, introduced themselves, one as an attorney and the other as an investigator, had contract blanks with them, had her sign one though she did not remember the attorney's name on it, told her she should employ Mr. Higgins to handle her case, and gave her about 30 of the latter's professional cards. She further testified that the next day a man identifying himself as Mr. Higgins telephoned her, told her to take her child to a certain doctor, and cautioned her not to give out any information until he told her; that she thereupon stated to petitioner that she already had a lawyer, whom she named and whom petitioner said that he did not know; that she then described the persons who had called on her the preceding day in petitioner's behalf, but petitioner disclaimed any knowledge of or connection with them. She also testified that some few days later petitioner came to her home, at which time her lawyer happened to be there; that petitioner talked with her husband

in the front room while she was talking to her lawyer in the kitchen; that petitioner then met her lawyer in the hall, that the two went outside to talk a few minutes, and that she did not see or hear from petitioner again. Mr. Augustus substantially corroborated his wife's account of the visit by the two men in petitioner's behalf. He added that they identified themselves as "members of Mr. Higgins' firm," gave him one of petitioner's cards, and told him that "all references in the case were . . . to be referred to [petitioner]" when they had his wife sign an agreement and took notes as to the happening of the accident. Mr. Augustus also corroborated his wife's account of petitioner's later visit to their home, adding that petitioner said "he came out to discuss the accident with [him]" and that he thereupon gave petitioner a statement because he took it for granted that petitioner was his attorney. Mr. Augustus likewise corroborated his wife's statement as to petitioner's meeting with the other lawyer in their home, and that after the conversation between the two, which he did not hear, he did not see petitioner again. The other lawyer testified that he had represented the Augustuses in some prior litigation; that on the day following the accident here in question, Mrs. Augustus telephoned to him, saying that if there were any legal problems involved, she wanted him to handle them; that nothing further was done in the matter until some 10 days later, when he received another call from Mrs. Augustus, wherein she said that "something funny was happening" in that some other attorney was trying to handle the case, that she wanted him [the witness] to handle the case, and that he thereupon went that evening to the Augustus home, where he met petitioner as previously related by both Mr. and Mrs. Augustus. He further testified that in his conversation with petitioner outside the Augustus home, petitioner stated that he did not know that the Augustuses had an attorney, and that a friend of the Augustuses had referred him to them; and that after some conversation about the doctor whom petitioner had recommended in the case, petitioner left. This lawyer also testified that he then returned to the Augustus home, asked them if they knew the alleged friend whom petitioner had identified as making the reference of his name to the Augustuses, and that both expressed ignorance of such person.

At the outset in testifying with respect to this charge, petitioner stated that his uncertainty on many points stemmed from the fact that a long period of time had elapsed between

the questioned occurrences and the date of his examination in these proceedings (about 10½ months), and that he had meanwhile handled a lot of litigation. He then testified that it was his "recollection" that Mrs. Augustus had first called him about the accident (which was directly contrary to the testimony of both Mr. and Mrs. Augustus that petitioner had first called her), and that she asked to see him about the accident. Petitioner testified to his later visit to the Augustus home for the purpose of getting the facts from Mr. Augustus, admitting the private talk between himself and the previously mentioned lawyer, and that he [petitioner], upon being advised of the former's employment in the case, left the Augustus home and "forgot about the matter." Petitioner denied knowing the persons whom the Augustuses described as first coming to their home in petitioner's behalf. Petitioner also stated that he had always practiced alone; that during the almost three years intervening between his admission to practice and the matters here in question, he had circulated between 7,000 and 8,000 of his professional cards, which number he later called only "an estimate," with the correction that he ordinarily ordered about 500 cards every six months, which he gave to "friends" and to those who came to his office for legal advice, suggesting that they keep him in mind. When asked about his employment of "investigators" at the time here in question, petitioner stated that for the purpose of checking police reports and interviewing witnesses, he had hired various persons, "part-time people," who "would do the work" for him "in the evening after they finished their regular occupations" but he could not recall any of their names. He characterized the whole matter of his investigating requirements as a "hit-and-miss affair," depending on what work had to be done, and sometimes he would "go out and make the investigation" himself. When asked whether his office records would show the names of the persons he had hired as investigators, petitioner stated that he was "not sure" because he did not keep records on such matters and usually just paid them in cash.

From the above summary of the record, it appears that the principal point of conflict in the evidence concerned the matter of whether petitioner had knowledge of the identity of the investigators and whether he had authorized their activities. However, there was abundant credible evidence that in both instances here in question a definite pattern was followed, wherein two men called at the respective homes soon

after the accidents, interviewed the parents, had them sign contracts, left some of petitioner's professional cards, and indicated that petitioner would communicate with them later, which he did. While petitioner denied any wrongdoing in these cases, maintaining that the referrals had come to him rather than his initiating the original contacts, his explanations appear vague and unconvincing, coupled with a professed inability to recall any of the essential points in relation to his admitted hiring of investigators as the occasion might demand. Such conduct, evasive testimony and lack of candor are not consistent with the high degree of fidelity to his professional duties owed by petitioner as an attorney at law. (*Burns* v. *State Bar*, 45 Cal.2d 296, 303 [288 P.2d 514].) Under the circumstances, the record amply supports the board's finding that in both instances petitioner violated rules 2 and 3 of the Rules of Professional Conduct in the solicitation of professional employment through the use of lay persons, and further justifies the board's added finding that these lay persons' activities were carried on with petitioner's knowledge, acquiescence and consent in pursuance of an established scheme or design.

While the record thus clearly shows petitioner's misconduct, there remains the question of the extent to which petitioner should be disciplined. In this connection petitioner claims that so far as he was concerned, no harm or damage was done to the clients in either instance, citing his termination of the Porter case through ultimate settlement (disregarding Mrs. Porter's stated dissatisfaction with the terms of the contract signed with petitioner) and his withdrawal from the Augustus case as soon as he learned that another lawyer was handling it. He further argues that any wrongdoing that might have occurred in these matters on his part was unintentional, attributable in the main to his inexperience and the "excitement of a young attorney" at the prospect of obtaining a case, causing him to overlook the proprieties in seeking professional employment. He also notes that there is no evidence in the record of any past misconduct on his part.

The controlling question, however, is not whether any harm or damage resulted to the particular clients from petitioner's handling of their affairs after he had obtained the contracts of employment. The rules which petitioner violated are primarily designed to prohibit unprofessional conduct in obtaining such contracts of employment regardless of the quality of the work which may be performed thereunder.

Petitioner's conduct in obtaining such contracts appears to have constituted an intentional, flagrant violation of the rules; and under all the circumstances, it further appears that the recommended discipline is appropriate and should not be reduced by this court.

It is ordered that William Higgins be suspended from the practice of law for a period of six months, commencing 30 days after the filing of this opinion.