[S. F. No. 19421. In Bank. May 15, 1956.]

EDWARD MILTON TONINI et al., Petitioners, v. STATE BAR OF CALIFORNIA, Respondent.

George G. Olshausen for Petitioners.

Garrett H. Elmore for Respondent.

THE COURT.—This is a proceeding to review a recommendation of the Board of Governors of The State Bar that petitioners be suspended from the practice of law for a period of three years.

Two show cause orders directed to petitioners were consolidated for hearing. They charged petitioners with having solicited legal business from some 10 persons, most of whom had suffered injuries in accidents, in violation of rule 2, section a, Rules of Professional Conduct (33 Cal.2d 27).[1]

The Board of Governors found the charges sustained and recommended that petitioners be suspended for one year on each count of the orders to show cause. In addition, the board recommended that petitioner Tonini's suspension on counts involving Walter F. Horn, Anthony J. Vargas, and the father of Ronald Reed, a minor, be made to run consecutively, the suspension on all other counts to run concurrently therewith. The same recommendation was made concerning petitioner MacDonald, except that the three counts recommended to run consecutively related to Eric Haak, Bessie Manson and Sylvan Lehman.

PETITIONERS' CONTENTIONS

*First: That the findings of the Board of Governors are not supported by the evidence.*

This claim is untenable. ██ The rule is settled that in a disciplinary proceeding against an attorney, findings of fact by local administrative committees and the Board of Bar Governors are not binding on the Supreme Court, which will weigh and pass on the sufficiency of the evidence to sustain the findings of the Board of Bar Governors.

██ It is also settled that the burden is upon the petitioner seeking a review of the Board of Bar Governors' recommendation to show that the findings are not supported by the evidence or that the recommendation of the Board of Bar

---

[1]Rule 2, section a, Rules of Professional Conduct reads: "A member of the State Bar shall not solicit professional employment by advertisement or otherwise."

Governors is erroneous or unlawful. (*Clark* v. *State Bar*, 39 Cal.2d 161 at 165 [1], [2] [246 P.2d 1].)

 Applying the foregoing rules to the record in the instant proceeding, it discloses that petitioner Tonini was admitted to practice law in 1946, and that petitioner Mac-Donald was admitted to practice law in 1951. Neither petitioner has been the subject of any previous disciplinary proceeding.

On the evening of Saturday, April 10, 1954, Sylvan Lehman was walking with Clara Mohr at Post and Leavenworth Streets, San Francisco. They were struck by an automobile while crossing Post Street at about 8 p. m. Mr. Lehman sustained a fractured hip and was taken to the City and County Hospital, thence to Mt. Zion Hospital about midnight. The following morning Mr. Lehman was called upon by petitioner MacDonald at Mt. Zion regarding his injuries, and he signed a contract employing Mr. MacDonald the following day.

Miss Mohr, 66 years of age, was injured in the same accident, sustaining a broken leg. The same course as to hospitalization was followed in her case as in that of Mr. Lehman. On the following morning petitioner MacDonald called upon her at the hospital and talked to her about employment in the case. The following day she signed a contract with him whereby he was employed to represent her.

About 11 p. m. on May 26, 1954, Erik Haak was involved in a collision at the intersection of Turk and Franklin Streets, sustaining a fractured neck and lesser injuries. He was taken to Emergency Hospital and then to Stanford Lane Hospital. The first or second day after the accident petitioner MacDonald called upon him at the hospital and solicited employment.

Marie Sisk was struck by a Greyhound bus about 7 p. m. on June 9, 1954. She died on the evening of the third day thereafter, having been in a comatose condition in Franklin Hospital after the accident and during the short period of illness. A man identifying himself as "Attorney MacDonald or his representative" telephoned Thomas Sisk, father-in-law of Marie Sisk, for the purpose of locating his daughter and also a sister of Marie Sisk in order that he might talk to them regarding the "injuries" to Marie. On the morning of June 13, petitioner MacDonald appeared at the family home in Southern California for the purpose of contacting and interviewing L. P. Sisk, the surviving husband of Marie Sisk.

On June 17, 1954, Mrs. Adele Harvey suffered minor injuries in an automobile collision. She was taken to Central Emergency Hospital for hospitalization by police officers investigating the accident. The next morning she was contacted by telephone by a man identifying himself as "Mr. MacDonald, a representative of Mr. Tonini." The caller stated he wanted to see her about the accident. An appointment was arranged for noon that day at petitioners' offices. She did not keep the appointment, and the person who had previously telephoned called again that afternoon wanting to know why she had not come down to the office, and he offered to come to her house.

On August 5, 1954, Walter Horn, a machinist, was seriously injured when struck by an automobile at 5th and Jessie Streets at 2:10 in the morning. He was taken in a semi-conscious condition to Central Emergency Hospital, where he was registered as "Walter Harm." About 7 a. m. of that day he was transferred to the City and County Hospital. Petitioner Tonini saw the injured man at the City and County Hospital twice on August 5 (the day of the accident), once briefly in the late afternoon and then a couple of hours later in the evening, at which time a contract of employment was signed by Mr. Horn. At the time Mr. Horn was admitted to the hospital he had an alcoholic breath and was extremely shaky, so much so that the nurses placed side boards or side rails on his bed to prevent him from falling out of it.

Early in the morning the following day, August 6, petitioner Tonini returned to the hospital and certain events took place regarding the verification of a complaint in an action, "Walter Harm, Plaintiff, vs. Allen E. Hertel et al." Petitioner Tonini signed the name "Walter Harm" as the person verifying a complaint he had prepared and later filed.

At this time Mr. Horn was able to sign his own name, as is indicated by the fact that on the same date he had signed a "Request for Admission and Agreement to Reimburse."

To the verification is affixed petitioner Tonini's signature as a notary public. Petitioner Tonini signed the verification with the intention of concealing Mr. Horn's mental condition at the time from defendants in the action which he was filing. This was done so that the inference would not be drawn that Mr. Horn was not then alert and lucid.

An examination of the complaint indicates on its face that petitioner endeavored to make it appear that Walter *Harm*

who signed the complaint was a different person from the person taking the notarial acknowledgment to the complaint.

There was no attempt to comply with the requirements of section 446 of the Code of Civil Procedure,[2] to wit, that when a pleading is verified by a person other than a party to the proceeding, the affidavit accompanying it shall state the reasons why the party did not verify the complaint.

On August 30, 1954, the 7-year-old son of William R. Reed was badly injured in an accident in San Francisco. About 7 p. m. Mr. Reed, his wife, and neighbors went to the City and County Hospital. The Reeds returned to San Jose in the early morning hours of August 31. In the afternoon of that day Mr. Reed called at the office of a San Jose attorney who had previously represented him. Shortly after midnight of the same day petitioner Tonini, identifying himself as Attorney Badliaco of San Francisco, telephoned Mr. Reed. He solicited the case and asked Mr. Reed to come right up to San Francisco. Mr. Reed refused, and suggested 10 a. m. the next day, at which time he went to petitioners' office. There petitioner Tonini revealed his true identity. Petitioner Tonini told Mr. Reed to make arrangements to go to an attorney in San Jose (Mr. Manina), described as "his partner."

On September 23, 1954, about 8 p. m., Mr. Clarence Urdahl, a janitor, was struck by an automobile. He was first taken to Park Emergency Hospital, then removed to the Southern Pacific Hospital. He sustained serious injuries. Peter Gray (whose family name was Garadis), an experienced claims investigator and adjuster and licensed as an insurance and real estate broker, was a long-time acquaintance of petitioner Tonini. About 7 a. m. the following morning petitioner Tonini telephoned Mr. Gray and asked him to call on Mr. Urdahl, whom petitioner described as "a client of his who was in the hospital whom he was supposed to go see on that morning and that he was unable to get there himself, but could later in that day." Petitioner Tonini supplied Mr. Gray with the name of the hospital and room number.

Mr. Gray went to see Mr. Urdahl, discussed the accident and fees on behalf of petitioner Tonini and obtained Mr.

---

[2]Section 446 of the Code of Civil Procedure reads in part as follows: "When the pleading is verified by the attorney, or any other person except one of the parties, he shall set forth in the affidavit the reasons why it is not made by one of the parties."

Urdahl's signature to a fee contract which he (Gray) had prepared in his own handwriting.

Mr. MacDonald stated that at approximately 9 a. m. the same morning, petitioner Tonini phoned from his office to his home saying, "I have got a new client in the SP Hospital. Pete Garadis has seen this man, and he, the man, has signed a 25 per cent contract. Go out." Petitioner MacDonald went to the hospital about 10 or 11 a. m., as an associate of petitioner Tonini, and had a conference with Mr. Urdahl.

At noon on the same day Mr. Gray saw petitioner MacDonald at his law office when he brought the paper signed by Mr. Urdahl. He told petitioner MacDonald that it was "the memorandum Mr. Urdahl signed"; that "Mr. Tonini had called him [Gray] and asked him to go see the man." The same afternoon petitioner MacDonald again called on Mr. Urdahl at the hospital.

On October 28, 1954, Anthony Vargas was injured while driving a mail truck which collided with another vehicle. He was taken to Central Emergency Hospital, where he remained about one half hour. He then reported back to the Post Office garage and went home. The evening of the next day Mr. Vargas found a card under his doorstep, that of petitioner Tonini, on the reverse of which was written, "Anthony Vargas, call me at home, GLenwood 3-7336, call collect, Tonini." The following day Mr. Vargas called the telephone number and talked with petitioner Tonini. The latter said he had placed the card under the doorstep; "that he would like to be engaged as my attorney" and to get in touch with him at his office. Mr. Vargas later met Mr. MacDonald in his law office and discussed the case.

The record further discloses that none of the persons involved in the accidents was known to, or had an acquaintance with, or was a former client of either petitioner, and that the visits and solicitations were without prior request or communication from the claimants or anyone authorized to act on their behalf.

Petitioner Tonini on several other occasions caused his clients to engage in fictitious transactions, and he failed on occasions to make a proper accounting to his clients.

On the night before a committee hearing of The State Bar, petitioners went to the home of Mrs. Manson, and petitioner Tonini told her she should hear what he had to say before she appeared to testify and that it would mean something to

her if she did. Mrs. Manson testified: "He wanted to know did I have to come down here (State Bar) . . . he would like to talk to me before I came down." She told him, "they (the State Bar) want to get you for everything because they asked me about everything . . . they found out everything . . . and how you got me, too." Thereupon, Tonini allegedly made the statement that she should come down to his office, even if she had to get a substitute, "because it might mean something and hear what I have to say first, before you go up there (State Bar)."

The foregoing evidence clearly supports the findings that petitioners were pursuing the practice familiarly known as "ambulance chasing" (see *Howe* v. *State Bar*, 212 Cal. 222 [298 P. 25]), and thus were violating rule 2, section a, Rules of Professional Conduct, *supra*.

■ *Second: That the punishment recommended by the Board of Bar Governors was excessive.*

Such contention is devoid of merit. The rule which petitioners violated was designed to prohibit unprofessional conduct in obtaining contracts of employment.

In the present proceeding the record discloses a callous and brazen indifference to the obligations of an attorney, with the object of personal gain. Under these circumstances petitioners should be removed from the practice of law for a substantial period of time in order that they may realize the error of their ways and rehabilitate themselves before again resuming a place in the ranks of the legal profession.

In *Waterman* v. *State Bar*, 14 Cal.2d 224 [93 P.2d 95], an attorney with a prior record, admitting three charges of ambulance chasing and who gave false testimony to the committee, was disbarred.

In *Mayer* v. *State Bar*, 2 Cal.2d 71 [39 P.2d 206], an attorney who persisted in advertising for divorce business during a one-year suspension for such conduct, was disbarred.

It is ordered that petitioners be suspended from the practice of the law in this state for the period of three years commencing 30 days after the date of the filing of this order.

CARTER, J.—I dissent.

While I agree with the majority that the record discloses unprofessional conduct of a somewhat serious nature on the part of both petitioners, I am of the opinion that the discipline ordered is too severe. Taking into consideration the

age and professional experience of both petitioners and the nature of the unprofessional conduct on their part as disclosed by the record, it is my opinion that a suspension from practice for the period of one year would be more in harmony with the discipline imposed for similar conduct in other cases which have come before this court.

It should be obvious that a three-year suspension from practice of law is almost equivalent to disbarment, and I do not believe that such severe punishment should be imposed on young, inexperienced lawyers for the character of conduct disclosed by the record here.

For the foregoing reasons I would suspend petitioners from the practice of law for the period of one year.

Petitioners' application for a rehearing was denied June 6, 1956, and the time for commencement of their suspension was extended to commence August 15, 1956. Carter, J., was of the opinion that the petition should be granted.