[L. A. No. 24883.   In Bank.   Apr. 18, 1958.]

ALVIN E. HONOROFF, Petitioner v. THE STATE BAR
OF CALIFORNIA, Respondent.

Morris E. Cohn for Petitioner.

Garrett H. Elmore and David K. Robinson for Respondent.

THE COURT.—This is a proceeding to review a recommendation of the Board of Governors of The State Bar that petitioner Alvin E. Honoroff be suspended from the practice of law for a period of nine months.

Petitioner was charged with the violation of his oath and duties as an attorney at law in that he engaged one Zachary Goodman to solicit professional employment for him, contrary to rules 2 and 3 of the Rules of Professional Conduct. (33 Cal.2d 27.) The local administrative committee found petitioner guilty on this charge and recommended his suspension from practice for nine months. The board, upon further hearing and review, approved and adopted, with slight modification, the findings of the local committee. It further added that petitioner knew that the legal representation in question, "if obtained, would be the result of, and caused by unauthorized and improper solicitation of professional legal employment . . . by Goodman," and that he "agreed to and . . . did compensate Goodman . . . for steering said professional employment" to him. The board recommended the same suspension period of nine months, with two members dissenting on the ground that the degree of discipline recommended was "too severe."

Petitioner, who is 38 years of age, was admitted to practice in this state in 1950. He has not been the subject of any previous disciplinary proceeding. He contends (1) that the evidence was insufficient to sustain the board's findings and (2) that in any event, its disciplinary recommendation is too severe. While such findings are not binding on this court, which will itself pass upon the sufficiency and weight of the evidence (*Higgins* v. *State Bar*, 46 Cal.2d 241, 242

[293 P.2d 455] ; *Clark* v. *State Bar,* 39 Cal.2d 161, 165 [246 P.2d 1]),. petitioner has the burden of showing wherein the decision of the board is erroneous or unlawful. (*Tonini* v. *State Bar,* 46 Cal.2d 491, 492-493 [297 P.2d 1] ; *Alkow* v. *State Bar,* 38 Cal.2d 257, 258 [239 P.2d 871].) He has not met that burden.

Mrs. Lola Meredith, the wife of Mills Meredith, and their two children were injured in the wreck of a Santa Fe train near Lomax, Illinois, on August 22, 1954. Petitioner, who was practicing in Los Angeles, read a newspaper account of the accident, including the names of persons injured. Among those listed were the names Meredith, Shugan, and D'Agostino. Shugan was an attorney in Los Angeles and a friend of petitioner. He and his wife were both injured in the wreck. D'Agostino's wife and children were also injured, but he was not in the accident. D'Agostino lived in Los Angeles. He had never known petitioner, professionally or otherwise. Petitioner made a note of these names, and he contacted D'Agostino relative to the injuries to his family.

About August 26, 1954, petitioner left by plane for Chicago. Petitioner testified that he had been contemplating a trip east for some time, to take a deposition and to attend a convention in Massachusetts, and was planning to stop in Chicago where he formerly practiced law. He further stated that when he read of the Santa Fe wreck and the injury to the Shugans, who were reported as hospitalized near the scene of the accident, he decided to make the trip at once as far as Chicago to see if he could be of any help. The deposition was never taken and petitioner never did attend the convention.

Petitioner spent a couple of days in Chicago with his former law associate, and then the two drove to the scene of the accident. Upon inquiry at the hospital where the Shugans had been patients, petitioner learned that they had already left. Then petitioner and his former Chicago law associate proceeded to investigate the accident, interviewed people who had been injured and others, and made notes. Petitioner stated that he might have ordered photographs and a copy of the coroner's transcript. He also made an attempt to see D'Agostino's family in the hospital. Up to this time petitioner had not been retained by anyone in connection with the accident, and his former law associate was never so employed. Petitioner returned to Chicago for a few more days and then flew back to Los Angeles shortly after the first of September. About a week later, petitioner talked to Shugan and gave him

his "evaluation of the case" but Shugan settled his own claim directly with the railroad, and petitioner had no connection with it.

On September 15, 1954, petitioner received a phone call from Zachary Goodman, whom petitioner had not previously met but who introduced himself as the husband of a distant cousin of petitioner. Goodman had worked for some 20 years as a "capper," primarily in the Chicago area, contacting persons who were involved in personal injury cases and signing them on contracts with attorneys, for which he received a percentage of the attorney fees. He had heard that petitioner had been in Illinois investigating the Santa Fe wreck, and he told petitioner that he had "a substantial matter" to discuss with him. Following the phone call, Goodman immediately went to petitioner's office.

The major conflict in the evidence concerns the exact nature of the conversation between petitioner and Goodman at this first meeting. According to Goodman, he told petitioner that he could bring in some cases whereby petitioner could make a lot of money; that he had had considerable experience in handling railroad cases, working on a percentage basis of the fee; and that he asked petitioner if he was financially in a position to handle such cases, which would mean the advance of living expenses to the litigants until the conclusion of their cases. Goodman stated that petitioner had on his desk a piece of paper on which he had listed the names of several persons who had been injured in the Santa Fe wreck. The words "Lola Meredith" with hospital notation "same place as Mrs. Shugan" were on this paper. Goodman further testified that he had not known of the Merediths before this time; that petitioner agreed to handle such cases from the Santa Fe accident as Goodman might get; that petitioner then gave him the above-mentioned list of names, whereupon Goodman said that he would try to contact the Merediths; petitioner said that was "all right with him," and Goodman, with petitioner's permission, telephoned from petitioner's office to Mr. Meredith in Iowa City, where Mrs. Meredith was then hospitalized.

According to petitioner, Goodman came to him seeking employment as an investigator, and he agreed to give Goodman some work. Goodman then stated that he had friends who had been injured in the Santa Fe wreck, asked petitioner if he would be interested in representing them, and petitioner replied that he would. Petitioner admits that in the course of

their discussion, he gave Goodman the mentioned list of injured persons as he had noted them, that Goodman telephoned Meredith from his office, in an adjoining room, and then told petitioner of his arrangement to meet Meredith in Iowa City the next day. Apparently, neither Goodman nor petitioner knew the Merediths, and this telephone call from Goodman was their first contact with the Merediths. Testimony of Meredith concerning this conversation is by way of stipulation. In this, Meredith stated that several weeks after the accident when he was in Iowa City, Iowa, where his wife was hospitalized, he received a telephone call from Los Angeles from a man who said that he was an attorney, giving petitioner's name, that he had an aunt who was injured in the same wreck as Mrs. Meredith, that he would be glad to represent him and would send some one to see him; that Goodman arrived the next morning, said that he had been sent by the attorney and gave him an advance on living expenses, which he said the attorney had told him to do; that prior to that time he had never known or heard of petitioner or Goodman.

Goodman, with petitioner's authorization, flew to Iowa City the evening of September 15, 1954. He met Meredith there the next morning. They discussed the accident and petitioner's ability to handle such cases. Meredith and Goodman flew back to Los Angeles that day, September 16. During the plane trip Goodman had Meredith sign a general one-third contingency fee contract for petitioner's employment in his case against the Santa Fe. Petitioner met Goodman and Meredith at the airport, and they arranged for a conference the next morning at petitioner's office.

At the scheduled meeting on September 17, petitioner discussed with Meredith the terms of employment and Meredith signed two more contingent fee contracts retaining petitioner, one covering the damage claim of the Meredith children and the other covering the claims of Mr. and Mrs. Meredith. Petitioner then arranged to advance weekly living expenses to Meredith until the conclusion of the case. Petitioner also gave Goodman a check for $854.62, partially itemized as reimbursement to Goodman for expenses on the Iowa City trip—which included Goodman's own round trip ticket, Meredith's single plane fare, money advanced to Meredith, and certain miscellaneous items—and with the sum of $350 left under the general note of "photography and investigation." Petitioner maintains that was the full amount he paid Goodman on that day, but Goodman claims that he received approximately

$2,500. Goodman's bank records and cash receipts for expenditures that day support his claim. The evidence indicates that immediately prior to this date Goodman was "broke."

About a week later petitioner gave Goodman a piece of paper listing a number of persons who were involved in the Santa Fe wreck and who had been noted in the newspaper article as in "serious condition." After the names there were various identifying notations, all in petitioner's handwriting, such as "released home"; "brother's case out"; "talked to sister-in-law, 'she' is out, see *brother personally.*" Petitioner stated that he had made these notes in connection with his investigation of the accident during his trip to Chicago in the latter part of August. He told Goodman to contact these people when he next went east.

It is not disputed that Goodman performed services in the Meredith case from its initial stages, September 15, 1954, until January 24, 1955, when petitioner, after having filed an action for the Merediths, was substituted out of the case. During this period Goodman devoted his entire time to the Meredith case, making some five or six trips to Iowa City with Meredith and keeping Meredith "happy" with his employment of petitioner. Petitioner admitted that he at no time checked Goodman's qualifications as an investigator or whether he was licensed to act as such, and Goodman never furnished any investigative reports, such as witness statements, photographs, or information concerning the happening of the accident. Petitioner continued to pay Goodman substantial sums but he was not sure of the exact amounts, the dates of payment, or whether or not he received vouchers, time records or expense statements from Goodman. He thought that he had received some accounting from Goodman after one or two of the trips to Iowa City but he was not able to produce any expense sheets from Goodman. The record indicates Goodman was paid over $6,300 for his work, of which some $1,250 appears to have been reimbursement for expenses. Receipts in various amounts were signed by Goodman without particular itemization or with the general note of "investigation." On December 2, 1954, petitioner had Goodman sign a note for $5,000, which petitioner claims was the approximate amount of moneys he had paid Goodman for expenses and services rendered to date. The note contains no mention of the Meredith case. It appears simply as a straight loan transaction, yet petitioner stated that Goodman did not owe him this money and there was no

intention that Goodman would pay it to petitioner. The Meredith case was ultimately settled, and the attorney who took over the case paid petitioner a percentage of the fee and petitioner's expenses listed as some $13,000.

The main question to be determined is whether petitioner employed Goodman to solicit the Meredith case. Petitioner maintains that he only employed Goodman to act as an investigator and that Goodman offered to refer the Meredith case to him, which offer petitioner accepted. He attacks the credibility and character of the admitted "runner" or "capper," Goodman, points to various contradictions and discrepancies in Goodman's testimony, and submits that without total reliance on Goodman's version of his employment, petitioner cannot be found guilty on the solicitation charge. While it might be said that Goodman's testimony was "less than satisfactory," that in certain details he may have been "not only careless with the truth" but may have also had "a tendency to embellish it," and that he apparently was "hostile and adverse" to petitioner, yet consideration of the record as a whole sustains the essential core of Goodman's story that petitioner knowingly embarked on the illicit venture of solicitation of the Meredith case through employment of Goodman for that purpose on their first meeting, September 15, 1954. Accordingly, reference will be made to certain passages of petitioner's own testimony and to various circumstantial factors showing petitioner's culpability.

First, there was petitioner's trip to Chicago and the scene of the accident about August 26, a few days after the Santa Fe wreck, where he entered upon extensive investigating and interviewing activities, incurred expenses in getting photographic and transcript reports, and made notes of contacts with several persons on the "serious condition" list, all at a time when he had not been retained to represent anyone in connection with the accident. When asked to explain various notations on his own handwritten lists of certain of the injured persons, petitioner was unable to "recollect" their meaning, and his testimony was clearly evasive. Petitioner claims that he made the trip to the scene of the accident as an act of service and from a desire to help his friend Shugan. However, petitioner did all his investigative work after he found that the Shugans had left the hospital where they had been patients, petitioner was never retained by Shugan to do any work on the case for him, and petitioner never submitted any investigative reports to the Shugans.

Petitioner admits that at their first meeting, September 15, 1954, he gave to Goodman his list of injured persons as he had selected them from the newspaper article he had read. On that list appeared the name "Lola Meredith." Goodman maintained that he never suggested the name "Meredith" as a possible referral to petitioner, and that he never knew the name until petitioner mentioned it, and then Goodman, with petitioner's authorization, telephoned Meredith at Iowa City and arranged his trip there. Goodman's account is supported by Meredith's stipulated testimony that he had never known either petitioner or Goodman until he received the telephone call at Iowa City, and then the next morning in Iowa City, he met Goodman when Goodman identified himself as the man sent by petitioner.

Furthermore, petitioner's records of Goodman's services and expenses are confusing and ambiguous. According to petitioner, only one or two of Goodman's several trips to Iowa City were covered by an accounting. While petitioner claimed that any advances he made to Goodman were "Oked" by Meredith on yellow sheets, these are "missing." Most of the payments to Goodman were in "round figures," bearing notations simply as "loan" or "investigation." There is no evidence that Goodman did any investigative work for petitioner, in the sense of furnishing reports, signed statements from witnesses, photographs, or other information bearing on the happening of the accident. According to the record, petitioner apparently paid Goodman about $6,300 for his services, including the substantial sum of $2,500 on September 17, 1954, the day the contracts were signed with Meredith in petitioner's office. In the course of his dealings with Goodman, petitioner had Goodman sign the fictitious note of $5,000 on December 2, 1954, as a straight loan transaction and without reference to the Meredith case. While petitioner claimed once that such sum approximated advances to Goodman as of that date, later petitioner stated that there was no intention that Goodman should repay such amount, that he did not owe it. ▇ The keeping of proper books of account, vouchers, receipts, and checks has significant bearing on the issue of an attorney's honesty and professional conduct when his actions are called into question. (*Cf. Clark* v. *State Bar, supra,* 39 Cal.2d 161, 174.)

▇ In short, it appears that on September 15, 1954, when petitioner and Goodman first met in petitioner's office,

petitioner was well acquainted with the facts of the Santa Fe wreck by virtue of his own trip to the scene of the accident in Illinois, his contacts with some of the injured persons, and other investigative work, all undertaken at his own expense but still without a client to represent. Consistent with this outlay of time and money, petitioner apparently was anxious to obtain employment in connection with this accident and engaged Goodman, an admitted "capper" or "runner" in railroad cases for some 20 years, to solicit the Meredith case. It further appears that petitioner reimbursed Goodman for all his expenses on his trip to bring Meredith, a stranger to both petitioner and Goodman, from Iowa City to Los Angeles. Thereafter, during the four months petitioner was handling the case, Goodman's entire time was devoted to "shepherding" Meredith and keeping him "happy." Petitioner paid Goodman $6,300 to cover such services and expenses of some $1,250. Such record clearly and convincingly indicates that petitioner knowingly accepted the Meredith case as solicited professional employment and compensated Goodman, pursuant to prior agreement, for his activities in steering such professional employment to him.

While the record thus shows petitioner's misconduct through the solicitation of professional employment, there remains the question of the extent to which petitioner should be disciplined. Petitioner makes no showing of mitigating circumstances but simply argues that a nine months' suspension from practice is too severe in view of other cases where a milder discipline was imposed: *Mitton* v. *State Bar,* 49 Cal.2d 686 [321 P.2d 13]; *Higgins* v. *State Bar, supra,* 46 Cal.2d 241. However, the aggravated circumstances of petitioner's misconduct indicate that the recommended discipline is appropriate. Petitioner appears to have been guilty of a callous and brazen indifference to his obligations as an attorney, with "the object of personal gain." (*Tonini* v. *State Bar, supra,* 46 Cal.2d 491, 497.) His vacillating conduct, his evasive testimony, and his lack of candor before the local committee were not compatible with the high degree of fidelity to his professional duties owed by an attorney at law. (*Burns* v. *State Bar,* 45 Cal.2d 296, 303 [288 P.2d 514].) His actions, in short, exhibit an intentional, flagrant violation of the rules designed to prohibit unprofessional conduct in obtaining contracts of employment. In these circumstances, it is proper that he should be suspended from the practice of law for a substantial period of time.

It is ordered that Alvin E. Honoroff be suspended from the practice of law for a period of nine months, commencing 30 days after the filing of this opinion.

Petitioner's application for a rehearing was denied May 14, 1958.